**No. 25-1373**

---

**United States Court of Appeals for the First Circuit**

---

JOHN DOE, Plaintiff-Appellant,

v.

SARA SMITH, Defendant-Appellee,

MAINE TRUST FOR LOCAL NEWS, L3C, d/b/a *Portland Press Herald/Maine Sunday Telegram*, Intervenor-Appellee.

---

On Interlocutory Appeal from the United States District Court for the District of Maine

Civil Action No. 2:23-cv-00423-JAW

---

**BRIEF AND ADDENDUM OF PLAINTIFF-APPELLANT JOHN DOE**

---

Gregory Brown (No. 1212935)
Louise M. Aponte (No. 1212800)
LOWE YEAGER & BROWN PLLC
920 Volunteer Landing, Suite 200
Knoxville, Tennessee 37915
(865) 521-6527

Stephen B. Segal (No. 1188949)
VERRILL DANA LLP
One Portland Square
Portland, Maine 04101
(207) 774-4000

*Counsel for Plaintiff-Appellant*

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Plaintiff-Appellant John Doe ("Doe") is an individual to whom Rule 26.1 of the Federal Rules of Appellate Procedure does not apply.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES...................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

STATEMENT OF JURISDICTION .........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE ................................................................3

   I.   The Parties............................................................................3

   II.  The NDA ............................................................................3

   III.  The Complaint .....................................................................4

   IV.  Doe's Motion to Proceed Under Pseudonym; The Magistrate's Order.........5

   V.   Intervenor's Motion .............................................................6

   VI.  Doe's Motion for Closure of Trial................................................6

   VII.  District Court's Order on Motion for Closure of Trial................................8

      A.   Legal Standards.........................................................8

      B.   The Request for Closure of Trial...........................................9

      C.   The Request for the Parties' Use of Pseudonyms at Trial ....................12

   VIII.   Doe's Notice of Appeal..........................................................14

SUMMARY OF ARGUMENT...............................................................14

ARGUMENT ......................................................................................16

I.    Standard of Review .........................................................................16

II.   The District Court erred in denying Doe's Motion for a closed trial............17

   A.    The *Kravetz* Balancing Analysis .............................................18

   B.    The District Court failed to consider Doe's contractual privacy rights in its analysis of "the degree to which the subject matter is traditionally considered private rather than public." ...................................20

   C.    The District Court failed to weigh the nature and degree of injury to Doe, the sensitivity of his Protected Subject Matter, and how the media intends to use his personal, confidential information.............................23

   D.    The District Court improperly relied on its apparent belief that Doe seeks to weaponize the NDA in the broader context of a custody dispute with Smith. ...........................................................................27

   E.    The District Court improperly relied on the straw man fallacy that "a party's wealth alone is not a legitimate reason to restrict the right of public access." ...........................................................................30

III.  The District Court erred in denying Doe's Motion to maintain pseudonyms for the parties and their family members through trial. .......................................31

   A.    The *MIT* "totality of the circumstances" test ...........................32

   B.    The District Court failed to consider all relevant circumstances. ..........34

      1.    No consideration of the NDA ...............................................35

      2.    No consideration of the lack of prejudice ...............................35

      3.    No consideration of the parties' consistent use of pseudonyms ............36

4. No consideration that actual identities will have no bearing on the outcome of the case and are of minimal interest to the public ..............37

5. No analysis of what change in circumstances now justifies terminating pseudonymity .........................................................................................38

C. The District Court failed to properly assess the three relevant paradigms warranting pseudonymity.......................................................................39

1. Doe's case fits solidly within the first paradigm....................................40

2. Doe's case fits solidly within the second paradigm. ..............................41

3. Doe's case fits solidly within the third paradigm...................................43

a. Chilling effect on Doe........................................................................43

b. Chilling effect on similarly situated future plaintiffs ........................46

c. No "opening of the floodgates" ..........................................................46

4. Doe's case implicates multiple paradigms. ...........................................47

D. The District Court relied on the improper determination that "Doe's dilemma is of his own making" because he chose to enforce the parties' NDA in court instead of engaging in confidential arbitration or mediation.............................................................................................48

E. The District Court improperly denied Doe's Motion for pseudonymity based on his wealth. ...............................................................................50

CONCLUSION .......................................................................................................51

iv

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adkins v. Children's Hosp. of the District of Columbia*,
    261 U.S. 525 (1923)..............................................................................21

*Allgeyer v. Louisiana*,
    165 U.S. 578 (1897)..............................................................................35

*Bernsten v. O'Reilly*,
    307 F. Supp.3d 161 (S.D.N.Y. 2018)....................................................49

*Board of Overseers of the Bar v. Carey*,
    2019 ME 136, 215 A.3d 229 (2019) ..............................................11, 28

*Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA)
    LLC*, 752 F.3d 82 (1st Cir. 2014)..........................................................16

*Chambers v. Baltimore & O.R. Co.*,
    207 U.S. 142 (1907)..........................................................................21, 48

*Cohen v. Beneficial Industrial Loan Corp.*,
    337 U.S. 541 (1949)................................................................................2

*Doe v. Amherst Cent. Sch. Dist.*,
    196 A.D.3d 9 (N.Y. App. Div. 2021) ....................................................41

*Doe v. Bodwin*,
    119 Mich. App. 264, 326 N.W.2d 473 (1982)......................................48

*Doe v. Buckingham Browne & Nichols Sch.*,
    No. 25-10176-FDS, 2025 WL 1314250 (D. Mass. Apr. 9, 2025) .................34, 42

*Doe v. Colgate Univ.*,
    No. 5-15-cv-1069, 2016 WL 1448829 (N.D.N.Y. Apr. 12, 2016) ......................36

*Doe v. Del Rio*,
    241 F.R.D. 154 (S.D.N.Y. 2006) ..........................................................41

*Doe v. Del Toro*,

    No. 1:23-cv-13112-JEK, 2024 WL 816511 (D. Mass. Feb. 27, 2024)...............41

*Doe v. Doe*,

    No. 20-cv-5329-KAM-CLP, 2020 WL 6900002 (E.D.N.Y. Nov. 24, 2020) ......43

*Doe v. MaineGeneral Med. Ctr.,*

    No. 1:24-cv-00220-NT, 2024 WL 3967172 (D. Me. Aug. 28, 2024) .................47

*Doe v. MIT*,

    46 F.4th 61 (1st Cir. 2022)............................................................................passim

*Doe v. Noem*,

    No. 1:25-cv-10495-IT, 2025 WL 990635 (D. Mass. Apr. 2, 2025)....................35

*Doe v. Smith*,

    105 F. Supp. 2d 40 (E.D.N.Y. 1999) ...............................................................41

*Doe v. State of Alaska*,

    122 F.3d 1070 (9th Cir. 1997) ...........................................................................37

*Doe v. Stegall*,

    653 F.2d 180 (5th Cir. 1981) .............................................................................39

*Doe v. Town of Lisbon*,

    78 F.4th 38 (1st Cir. 2023).........................................................................32, 33

*Doe v. Trs. of Boston Univ.*,

    No. 24-10619-FDS, 2024 WL 4700161 (D. Mass. Nov. 6, 2024)...............passim

*Doe v. U.S. Sec'y of State*,

    707 F. Supp. 3d 142 (D.N.H. 2023).............................................................38, 44

*Doe v. W. New England Univ.*,

    No. 3:19-30124-TSH, 2019 WL 10890195 (D. Mass. Dec. 16, 2019)...............47

*Does 1-3 v. Mills*,

    39 F.4th 20 (1st Cir. 2022)................................................................................16

*Does v. Mills*,

    No. 1:21-cv-00242-JDL, 2022 WL 1747848 (D. Me. May 31, 2022) ..........30, 47

*Fashion House, Inc. v. Kmart Corp.*,

    892 F.2d 1076 (1st Cir. 1989) ...............................................................................16

*In re Exch. Union Co.*,

    No. 24-mc-91645-ADB, 2025 WL 894652 (D. Mass. March 24, 2025).......32, 44

*In re T.R.,*

    556 N.E.2d 439 (Ohio 1990)................................................................................22

*Jackson v. Sleek Audio, LLC*,

    No. 13-80725-CIV-MARRA, 2013 WL 12384284 (S.D. Fla. Oct. 8, 2013) ......49

*Jakuttis v. Town of Dracut, Massachusetts*,

    656 F. Supp. 3d 302 (D. Mass. 2023) .................................................................36

*James v. Jacobson*,

    6 F.3d 233 (4th Cir. 1993) ..................................................................................46

*Jankula v. Carnival Corp.*,

    No. 18-cv-24670-UU, 2019 WL 8051719 (S.D. Fla. Sept. 5, 2019)...................49

*Lawes v. CSA Architects and Engineers LLP*,

    963 F.3d 72 (1st Cir. 2020)..................................................................................16

*Malibu Media, LLC v. Doe*,

    No. 15-cv-2624-ER, 2015 WL 6116620 (S.D.N.Y. Oct. 16, 2015) ....................37

*Meyer v. Nebraska*,

    262 U.S. 390 (1923)............................................................................................35

*Nixon v. Warner Commc'ns, Inc.,*

    435 U.S. 589 (1978)......................................................................................19, 27

*Orr v. Trump*,

    No. 1:25-CV-10313-JEK, 2025 WL 848691 (D. Mass. Mar. 18, 2025) .............44

*Ospina v. Trans World Airlines, Inc.*,

    975 F.2d 35 (2d Cir. 1992).................................................................22

*Patrick Collins, Inc. v. Does 1-38*,

    941 F. Supp. 2d 153 (D. Mass. 2013) .................................................44

*People ex rel. Union Bag & Paper Corp. v. Gilbert*,

    256 N.Y.S. 442 (Sup. Ct. 1932) .........................................................50

*Publicker Industries, Inc. v. Cohen*,

    733 F.2d 1059 (3d Cir. 1984).............................................................22

*Standard & Poors Corp. v. Commodity Exchange, Inc.*,

    541 F. Supp. 1273 (S.D.N.Y. 1982)...................................................22

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,

    966 F.3d 46 (1st Cir. 2020).................................................................10

*U.S. v. Amodeo*,

    71 F.3d 1044 (2d Cir. 1995)....................................................19, 20, 27

*U.S. v. Kravetz*,

    706 F.3d 47 (1st Cir. 2013).........................................................*passim*

*U.S. v. Sorren*,

    605 F.2d 1211, (1st Cir. 1979).............................................................2

## Statutes

28 U.S.C. § 1291 .....................................................................................2

28 U.S.C. § 1332 .....................................................................................1

## Other Authorities

8 C. WRIGHT & A. MILLER FEDERAL PRACTICE AND PROCEDURE §

    2018, at 145......................................................................................48

Alexandra Twin, *Non-Disclosure Agreement (NDA) Explained, With Pros and Cons*, INVESTOPEDIA (May 15, 2025) https://www.investopedia.com/terms/n/nda ......................................................................................................28

Benjamin P. Edwards, *When Fear Rules in Law's Place: Pseudonymous Litigation as a Response to Systematic Intimidation*, 20 VA. J. SOC. POL'Y & L. 437, 472 (2013) ....................................................................................45, 46

Charles Trepany, *Powerball sells winning $1.76B ticket. Why are we so obsessed with the lottery?*, USA TODAY, (Oct. 12, 2023)....................................................24

Emily Allen, *Maine's 1B lottery winner will have to reveal his identity if privacy case goes to trial*, PORTLAND PRESS HERALD (April 15, 2025), https://www.pressherald.com/2025/04/15/maines-1b-lottery-winner-will-have-to-reveal-identity-if-privacy-case-goes-to-trial....................................................25

Emily Allen, *Woman says Maine's Mega Millions winner is using lawsuit to pressure her in child custody case*, PORTLAND PRESS HERALD (February 8, 2024), https://www.pressherald.com/2024/02/08/woman-says-maines-mega-millions-winner-is-using-lawsuit-to-pressure-her-in-child-custody-case/...........25

Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353, 1378 (2022) ....................................................................38, 42, 45

Jayne S. Ressler, *#Worstplaintiffever: Popular Public Shaming and Pseudonymous Plaintiffs*, 84 TENN. L. REV. 779, 825-26 (2017) ....................................................46

Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. KAN. L. REV. 195, 253 (2004)................45

Joan Steinman, *Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted to Keep their Identities Confidential?,* 37 HASTINGS L.J. 1, 33 (1985) ....................................................................................39, 48, 49

Justin Rohrlich, *Billion-Dollar Mega Millions Winner Sues Baby Mama for Telling Fam about Payout – Rich Guy Problems*, THE DAILY BEAST (November 15,

2023, at 5:52 EST), https://www.thedailybeast.com/dollar135-billion-mega-millions-winner-sues-baby-mama-for-telling-fam-about-payout/ .......................26

Kevin Bennett Ph.D, *The 3 Worst Fears about Winning the Lottery,* PSYCHOLOGY TODAY (June 14, 2023), https://www.psychologytoday.com/us/blog/modern-minds/202306/the-3-worst-fears-about-winning-the-lottery ..............................24

Steve Janoski, *Mega Millions winner sued by family for breaking promise to share $1.35B jackpot*, NEW YORK POST, (May 14, 2024, at 12:40 ET), https://nypost.com/2024/05/14/us-news/mega-millions-jackpot-winner-sued-by-family-for-breaking-promise-to-share-1-35-billion-prize-report/.......................26

*The Dangers of Winning the Lottery*, LOTTO ANALYST, https://www.lottoanalyst.com/the-dangers-of-winning-the-lottery ....................24

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument should be permitted pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure as it would significantly aid this Court's decisional process.

## STATEMENT OF JURISDICTION

The District Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the matter in controversy exceeds $75,000.

On January 10, 2025, the District Judge asked the parties to brief the issue of whether any trial in this breach of non-disclosure agreement case should be closed to the media and public and subsequently set a briefing schedule that would allow for an interlocutory appeal to this Court in advance of trial. Appendix ("App.") 43-44. On February 7, 2025, Doe filed his Motion for Closure of Trial ("Motion"), seeking to (1) close any trial in this case to the media and public, and (2) permit the parties and their family members to maintain their pseudonyms through trial. App. 44. On April 10, 2025, the District Court entered an order denying Plaintiff's Motion (the "Order"). Addendum ("Add.") 2. On April 14, 2025, Doe timely filed his Notice of Appeal pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure. App. 122.

This Court has appellate jurisdiction over Doe's appeal pursuant to the collateral order doctrine, which allows for an immediate appeal under 28 U.S.C. §

1291 of orders that are deemed "final" under the test set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545-47 (1949) and its progeny. *See U.S. v. Sorren*, 605 F.2d 1211, 1213 (1st Cir. 1979) (gleaning four requisites of appealability from *Cohen* and the cases applying it). The "pseudonym question" is immediately appealable under the collateral order doctrine. *Doe v. MIT*, 46 F.4th 61, 66 (1st Cir. 2022). Similarly, the question of a closed trial is immediately appealable under the collateral order doctrine and the four-part test set forth in *Sorren* because the consequences to Doe from public access to his confidential information make the Order "important," the closed trial question is completely "separable" from the merits of the breach of contract claim, and the Order is "final" and would be "effectively unreviewable" after a public trial. *Cf. id.* (analyzing how pseudonym question satisfies four-part test of collateral order doctrine).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in denying Doe's Motion with respect to his request for a closed trial, by ignoring material factors weighing heavily against public access and misapplying the balancing analysis under *U.S. v. Kravetz*.

2. Whether the District Court erred in denying Doe's Motion with respect to his request for continued pseudonymity through trial by ignoring relevant circumstances weighing heavily in favor of pseudonymity, failing to properly assess three relevant

paradigms warranting pseudonymity, and relying on improper determinations in its application of the "totality of the circumstances" test under *Doe v. MIT*.

## STATEMENT OF THE CASE

### I.     The Parties

Pseudonymous Doe and pseudonymous Defendant-Appellee Sara Smith ("Smith") are the parents of a minor daughter ("Daughter"). App. 53.  They live in separate states. App. 52.

### II.     The NDA

In January 2023, Doe won $1.35 billion in the Maine State Lottery. Add. 52. Due to the unique safety, security, and privacy concerns associated with winning the lottery, Doe hired a highly respected security firm and was advised to strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and Daughter's safety and privacy. App. 53; Add. 53.

On February 8, 2023, Smith agreed to enter into a Non-Disclosure Agreement ("NDA") with Doe to promote the safety and security of Doe, Smith, and Daughter and to avoid the irreparable harm of allowing the media and public to discover, among other things, Doe's identity, physical location, and assets.  App. 53. The NDA states in relevant part:

> the parties agree that disclosure of [Doe's] identity…could cause irreparable harm to both parties, their daughter, close family members, friends, and associates if members of the media or the public seek to discover [Doe's] identity and assets.

Add. 42.  The NDA requires Smith to hold in confidence and not to disclose, without

notice or consent, Doe's "Protected Subject Matter," namely:

> information indicating that [Doe was the winner of the Maine lottery in
> January of 2023], the amount or existence of any assets of [Doe], the
> amount of any assets being conveyed to the Daughter by [Doe], the
> existence of children, family members, friends, and business associates,
> identity of the physical location or assets of [Doe], or other information
> which [Smith] reasonably knows not to disclose to protect [Doe's]
> privacy.

Add. 42-43; App. 53-54. The NDA further provides that Doe is entitled to temporary

injunctive relief and other legal and equitable remedies in the event of Smith's

breach. Add. at 44.

## III.    The Complaint

In or about September 2023, Doe discovered that Smith had violated the NDA

by disclosing his Protected Subject Matter to third persons without Doe's

permission. App. 55.  On November 14, 2023, Doe filed suit against Smith in the

District of Maine, requesting that the court, among other things: (1) enter preliminary

and permanent injunctive relief against further breaches by Smith of the NDA; and

(2) require Smith to abide by the "Notice of Breach" provision of the NDA and

immediately report in writing the identity of the persons to whom each unauthorized

disclosure was made and Smith's efforts to minimize its republication. App. 57.  Doe

asserted that Smith's unauthorized disclosure of his Protected Subject Matter to third

parties caused him to suffer irreparable injury and to face immediate and imminent danger for which there is no adequate remedy at law. App. 56.

## IV.   Doe's Motion to Proceed Under Pseudonym; The Magistrate's Order

Upon filing suit, Doe immediately moved for leave of both parties to proceed under pseudonym and for a Protective Order redacting the parties' names and addresses from all documents filed with the Court. Add. 51.  Doe argued, among other points, that: (1) his identity had been kept confidential prior to that time through the NDA; (2) he had substantial concern about the effect of disclosure on his and Daughter's safety, privacy, and mental health based on the ongoing threat assessments of his security team; (3) requiring him to disclose his identity might deter similarly-situated litigants from seeking to enforce NDAs that protect their identity and confidential subject matter; (4) the public's unhealthy obsession with the lottery and lottery winners could place him and Daughter at a heightened risk of harm if his identity were to be publicized in open litigation; (5) he might decide to forego the action if not allowed to proceed under pseudonym and thereby forfeit his right to recover injunctive relief and damages; and (6) his sole motive was to protect his and Daughter's safety and privacy from the specific challenges and harms laid out by his security team.  *Id.*  Doe further asserted that he is not a public figure and that any interest in open judicial proceedings would not be impeded given the

minimal value of his identity to the public. *Id.* The Magistrate Judge granted Doe's motion without opinion.  App. 8.

## V.    Intervenor's Motion

On February 20, 2024, Intervenor-Appellee Maine Trust for Local News, L3C d/b/a *Portland Press Herald/Maine Sunday Telegram* ("Maine Trust") moved for leave to intervene for the limited purpose of unsealing judicial records. *See* App. 15. On March 22, 2024, the District Court granted the motion to intervene and granted in part and denied in part Maine Trust's motion to unseal. *See* App. 19.

## VI.    Doe's Motion for Closure of Trial

On January 10, 2025, the District Judge observed in a status conference among the parties that Doe would be faced with a "Catch-22" if this case were to proceed to a public trial.  *See* App. 43. That is, even if Doe were to win on his claims, his identity and confidential information would be revealed to the media and the public, which is exactly what he brought suit to avoid. Accordingly, the District Judge requested that the parties brief the issue and obtain a ruling that would allow for an interlocutory appeal to this Court in advance of trial. *See* App. 44.

Doe filed his Motion on February 7, 2025, Smith and Maine Trust filed their respective oppositions to the Motion on February 28, 2025, and Doe filed both his Reply to Opposition by Defendant and Reply to Opposition by Intervenor on March 14, 2025, seeking to close any trial in this case to the media and public and to permit

the parties and their family members to maintain their pseudonyms through trial. [1]
*See* App. 44, 47-49.

As to closure of trial, Doe argued, among other points, that (1) there is no
absolute right of public access to civil trials, based either in the First Amendment or
common law; (2) this Court articulated in *U.S. v. Kravetz*, 706 F.3d 47 (1st Cir. 2013)
that "important countervailing interests" can, in given instances, overwhelm the
usual presumption and defeat access; and (3) this is one of those exceptional cases
where  issues of identity, privacy, and safety are inextricably intertwined and central
to the underlying merits of the case, thereby warranting the closure of any trial in its
entirety to the media and public.  *See* Add. 4-7, 17-19.

As to the continued use of pseudonyms through trial, Doe cited to his Motion
to Proceed Under Pseudonym (Add. 51) and the reasons set forth therein for using
party pseudonyms.  Doe further argued, among other points, that (1) there is no per
se rule that parties must reveal their identities once their case goes to trial; (2) the
continued use of pseudonyms is justified where Doe's identity – and its public
disclosure – is central to this case; (3) in *Doe v. MIT*, 46 F.4th 61 (1st Cir. 2022),
this Court articulated three relevant paradigms in which pseudonymity is warranted:

---

[1] Doe's Motion and Replies alternatively requested that the District Court consider
the partial closure of any trial and trial testimony by telephone or audio-only Zoom.
Doe is not pursuing his proposed alternatives argument on appeal. *See* Add. 8, 18-
19.

(a) where a would-be Doe reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological); (b) where identifying the would-be Doe would harm innocent non-parties; and (c) where the injury litigated against would be incurred as a result of the disclosure of the party's identity; and (4) all three of those paradigms are satisfied here. *See* Add. 7-8, 17-19.

## VII. District Court's Order on Motion for Closure of Trial

On April 10, 2025, the District Court entered its Order denying Plaintiff's Motion in its entirety. Add. 2.

### A. Legal Standards

The District Court acknowledged the "unsettled state of Supreme Court and First Circuit authority" as to the applicability of the First Amendment to the public access issue. Add. 20. It determined, therefore, that it would follow this Court's "prudential practice" of "foregoing broad constitutional holdings unless such holdings are unavoidable" and instead resolve the public access issue "using the standards in the common law right of access." *Id.*

As to a common law right of public access, the District Court recognized this Court's ruling in *Kravetz* that "[t]hough the public's right of access is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." Add. 21. It then articulated that *Kravetz* directs district courts to conduct a "balancing analysis" of competing interests in

cases where the presumption of public access applies and to consider: (1) whether the personal privacy interests of parties and third parties are at stake; and (2) the degree to which the subject matter is traditionally considered private rather than public, noting that "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." Add. 22-23.  The District Court also gave "special consideration" to the fact that Maine Trust, a member of the press, is seeking access to a civil trial in this case, quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) for the proposition that having the media in attendance at a *criminal* trial "contributes to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system." Add. 23-24.

### B.    The Request for Closure of Trial

Relying on precedent and principles in support of public access and the vital role of the press, the District Court ruled that "Doe's request that the trial itself be closed to the public is a nonstarter" and that "[a] publicly filed court case is no longer a private matter." Add. 24.  Citing *Kravetz*, the District Court considered the degree to which the subject matter of this case is traditionally considered private rather than public and concluded that the information at the heart of this dispute – "the parties' individual finances, family affairs including those involving their minor daughter,

and …information the parties deem to be embarrassing and that they would prefer to keep private" -- is routinely described in published Maine divorce cases and custody cases and therefore, "undeniably [a] matter[] of public interest." Add. 27, 30. Noting from other filings in the case that Doe and Smith have sought sanctions against each other, the District Court characterized this case as a "devolved" litigation involving "NDA allegations [that] are in the broader context of contested custody litigation in state court." Add. 29.

As to the NDA, the District Court acknowledged that non-disclosure agreements generally are "not disfavored under Maine law," but proceeded to distinguish the NDA in this case from those non-disclosure agreements arising from the trade secret or business context,[2] asserting that "[i]n some contexts, NDAs have more recently become controversial." Add. 30 (citing Johanna Shinners, *Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Regulation*, 25 MARQ. BENEFITS & SOC. WELFARE L.R. 229 (2024)). The District Court did not distinguish the "weaponized NDAs" described in the Law Review article that it cited – NDAs used to conceal misconduct and shield perpetrators of sexual assault and harassment -- from the NDA in this case.  Rather,

---

[2] The District Court observed that, even in the business context, this Court has declined to enforce NDAs that are overly broad, citing *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46 (1st Cir. 2020) (non-compete NDA overly broad where it extended to public information and general knowledge not particular to employer).  Add. 30.

it cited *Board of Overseers of the Bar v. Carey*, 2019 ME 136, 215 A.3d 229 (2019), a Maine Law Court case in which the court imposed discipline upon an attorney who sexually harassed a female and entered into a NDA with her to silence her as a potential witness against him. Add. 30-31.  The District Court then posited, "[h]ow Maine law should treat the NDA in the instant case, a non-business agreement designed to keep a former intimate partner from revealing wealth in the broader context of a custody dispute, is a legitimate matter of public concern." Add. 31.  In so doing, it did not address the fact that the parties entered into their NDA *before* Smith brought a custody dispute against Doe.[3]

The District Court then noted that Maine Trust seeks access to the trial, and ruled that the Supreme Court's observations in *Richmond Newspapers* about the vital role of the press in monitoring the courts "extend beyond criminal law to the civil administration of justice." Add. 31-32.

The District Court further asserted that "one of Mr. Doe's main points is that because he is now wealthy, the consequences of his filing this lawsuit are different for him as opposed to less financially fortunate individuals. He fears his new-found wealth will make him the target of an inquisitive and occasionally malevolent people." Add. 32.  The District Court did not quote or provide a citation from Doe's

---

[3] It is undisputed that Doe and Smith entered into their NDA on February 8, 2023, and Smith filed her custody complaint on March 1, 2023.  *See* App. 89.

Motion to support its assertion. Nor did it recognize or consider the language of the NDA that states, "the parties agree that disclosure of [Doe's] identity as a winner of the $1.35 Billion Jackpot of the Maine State Lottery could cause irreparable harm to both parties, their daughter, close family members, friends, and associates if members of the media or the public seek to discover [Doe's] identity and assets." Instead, the District Court quoted the following from Doe's prior Motion to Proceed Under Pseudonym:

> There are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and dramatic. Plaintiff has had to hire a highly respected security firm and strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy.

*Id.* The District Court then cited its duty to administer justice equally to the poor and to the rich and concluded that "it cannot reconcile its sworn oath with Mr. Doe's demand that his trial be closed to the public because he is rich." Add. 33. On these grounds, the District Court declined to grant Doe's request for a closed trial, either partially or fully. *Id.*

### C. The Request for the Parties' Use of Pseudonyms at Trial

Citing *MIT*, the District Court stated that it would apply this Court's conclusion that there is a "strong presumption against the use of pseudonyms in civil litigation," to this case. Add. 34. It then proceeded to list the four general categories of exceptional cases in which the *MIT* Court found that party anonymity ordinarily

will be warranted, finding that "only two of the four MIT factors appear in this case: Doe's fears of severe harm from disclosure and his concern of harm to his daughter, an innocent third party." Add. 34-35. The District Court made no mention of the third *MIT* factor raised by Doe: where anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated, found typically in cases where the injury litigated against would be incurred as a result of the disclosure of a party's identity. Instead, it concluded that the risk of harm to Doe and Daughter "from disclosure of a sudden fortune" does not fit this case within the narrow group of exceptional cases where anonymity is allowed, and that "the entire tier of rich and famous persons could be subject to the same risks Mr. Doe fears." Add. 35-36. The District Court added that with "great wealth comes the financial capacity to afford enhanced security and privacy." Add. 36. As to Daughter, the District Court concluded that her privacy would not be in jeopardy if Doe's name were revealed and that, in any event, this possibility does not justify the use of pseudonyms at trial. Add 37.

The District Court noted that "Doe faces a classic Catch-22: a lawsuit to enforce his NDA, which prohibits the disclosure of private information and an upcoming trial at which the private information could be publicly disclosed." Add 36. But it concluded that "Doe's dilemma is one of his own making," and that the NDA "contained the seeds of its own ineffectiveness" by providing Doe with

temporary injunctive relief that only a court can issue, instead of a confidential arbitration or mediation. Add. 36-37.

Finally, the District Court declined to hold oral argument on Doe's motion, citing Doe's stated intention to appeal an unfavorable ruling to this Court. Add. 40.

## VIII.   Doe's Notice of Appeal

On April 14, 2025, Doe filed his Notice of Appeal of the Order denying his Motion for a closed trial and the continued use of pseudonyms. App. 122.

## SUMMARY OF ARGUMENT

First, with respect to the issue of closure of trial, this Court's decision in *U.S. v. Kravetz*, 706 F.3d 47 (1st Cir. 2013) is instructive in setting forth the factors that a district court should consider in determining whether to close a trial to the public, including: (a) the degree to which the subject matter is traditionally considered private rather than public; (b) the privacy rights of the parties and third parties; and (c) the nature and degree of injury, taking into consideration the sensitivity of the information and the subject, and how the party seeking access intends to use the information.

The District Court erred in applying *Kravetz* and denying Doe's Motion for a closed trial by: (a) failing to consider Doe's contractual privacy rights in its analysis of the degree to which the subject matter is traditionally considered private rather than public; (b) failing to weigh the nature and degree of injury to Doe, the sensitivity

of his Protected Subject Matter, and how the media intends to use his confidential information; (c) suggesting that Doe seeks to weaponize his NDA in the broader context of his custody dispute with Smith; and (d) improperly concluding that Doe seeks a closed trial because of his wealth.

Second, with respect to the issue of continued use of pseudonymity during any trial in this matter, this Court's decision in *Doe v. MIT*, 46 F.4th 61 (1st Cir. 2022) sets forth a "totality of the circumstances" test to determine whether to grant pseudonymity. The test requires a district court to take into account all relevant circumstances, independent of and including four paradigmatic situations in which proceeding under pseudonym is appropriate.

The District Court erred in denying Doe's Motion for continued pseudonymity by: (a) failing to consider all relevant circumstances, including the NDA at issue, the lack of prejudice to Smith, the parties' consistent use of pseudonyms to date, the minimal interest to the public, and the lack of a change in circumstances; (b) failing to properly assess the three relevant *MIT* paradigms that weigh heavily in favor of pseudonymity; (c) reasoning that Doe should have engaged in arbitration or mediation instead of filing suit; and (d) reasoning that Doe is wealthy enough to mitigate the harm of litigating in public.

Based on the foregoing reasons, as set forth more fully below, Doe respectfully requests that the District Court's Order be vacated and remanded.

## **ARGUMENT**

### I.    **Standard of Review**

This Court should review the District Court's Order allowing media and public access to the trial and disallowing the continued use of pseudonyms through trial under an abuse of discretion standard. *MIT*, 46 F.4th at 66 (citing *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022)). Abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Fashion House, Inc. v. Kmart Corp.*, 892 F.2d 1076, 1081 (1st Cir. 1989) (quotation omitted). "This standard is not monolithic: within it, embedded findings of fact are reviewed for clear error, questions of law are reviewed de novo, and judgment calls are subjected to classic abuse-of-discretion review." *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014) (quotation omitted). On abuse-of-discretion review, the Court will reverse a trial court's decision if it determines that the judge committed a "material error of law" or a "meaningful error in judgment." *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 90 (1st Cir. 2020) (citation omitted).

**II.    The District Court erred in denying Doe's Motion for a closed trial.**

Although a qualified right of the media and public to attend criminal trials is well established, a corresponding right to attend civil trials has never been upheld by the Supreme Court or this Court. Based on the "unsettled state of Supreme Court and First Circuit authority" as to whether the First Amendment applies to the issue of public access, the District Court properly focused on the balancing analysis set forth in *Kravetz* to determine whether the media and public have a common law right to attend a trial in this case. In so doing, however, the District Court failed to consider Doe's legal right to make and enforce a personal NDA in its analysis of "the degree to which the subject matter is traditionally considered private rather than public."  It further failed to weigh the nature and degree of injury to Doe, the sensitivity of his Protected Subject Matter, and how the media intends to use his private, confidential information. Instead, the District Court suggested that Doe is weaponizing the NDA in the broader context of the parties' child custody dispute and using his wealth as a shield. It seemingly based its decision on this misconception, deeming how Maine law treats the NDA "a legitimate matter of public concern" and reasoning that "a party's wealth alone is not a legitimate reason to restrict the right of public access." App. 31-32.

### A.    The *Kravetz* Balancing Analysis

Doe acknowledges that *Kravetz* specifically addressed the public's right of access to civil discovery, not a civil trial. *Kravetz*, 706 F.3d at 47.  But in so doing, it set forth the guiding principle that the public's right of access is "not unfettered" and that "[i]mportant countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Id.* at 59.  Relevant here, the *Kravetz* Court ruled that "a court must carefully balance the presumptive public right of access against the competing interests that are at stake in a particular case, keeping in mind that "only the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access." *Id.* quoting *In re Providence Journal Co., Inc.*, 293 F.3d 1, 10 (1st Cir. 2002).

Addressing the balancing analysis that courts are to employ, the *Kravetz* Court found that courts should "consider the degree to which the subject matter is traditionally considered private rather than public." *Id.* at 62.  It specified that "[p]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access" and that "third-party privacy rights in particular, have been referred to as "a venerable common law exception to the presumption of access and weigh heavily in a court's balancing equation." *Id.*  As to subject matter that is traditionally considered private, this Court observed that "[f]inancial records of a wholly owned business, family affairs,

18

illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.*

The *Kravetz* Court further found that courts must weigh "the nature and degree of injury," taking into consideration "the sensitivity of the information and the subject" and "how the person seeking access intends to use the information." *Id.* (quoting *U.S. v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995)). The Court reasoned, by way of example, that those seeking public access to wage a personal vendetta or to gain a commercial advantage over a rival, "need not be indulged in the name of monitoring the courts." *Id.*

As to "highly personal information" such as medical records and "subjective remarks about a patient's demeanor, character, and mental state," the *Kravetz* Court cautioned against disclosure, citing the Supreme Court case, *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589 (1978), and *Amodeo*. *Id.* at 61-62. Significantly, the *Nixon* Court noted that the common-law right of access should be denied where it might otherwise become a "vehicle for improper purposes." *Nixon*, 435 U.S. at 598. The *Nixon* Court observed that courts have the power to ensure that disclosure is not used "to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case or of "libelous statements for press consumption." *Id.* Similarly, the *Amodeo* Court found that

privacy interests should weigh heavily in a court's balancing equation, noting that "[c]ourts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure." *Amodeo*, 71 F.3d at 1051 (quoting *In re Caswell*, 18 R.I. 835, 836, 29 A. 259, 259 (1893)).

The *Kravetz* Court concluded that a district court is required to state with specificity its finding as to a common-law right of access.

**B.    The District Court failed to consider Doe's contractual privacy rights in its analysis of "the degree to which the subject matter is traditionally considered private rather than public."**

Despite *Kravetz* and the District Court's acknowledgment that "[p]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access," the District Court improperly announced at the start of its analysis that Doe's request for closure of a civil trial is a "nonstarter" on the grounds that "[a] publicly filed court case is no longer a private matter" and that "[i]n bringing this case, Mr. Doe turned to a forum established by the United States Constitution, funded by American taxpayers, comprising a branch of the federal government, whose procedures *must be open* and whose rulings *must be a matter of public record*." Add. 24-25 (emphasis added).

In so doing, the District Court failed to consider the language of the parties' NDA and Doe's constitutional right to make and attempt to enforce in court that NDA to protect his and Daughter's safety and personal privacy. The NDA

specifically shields Doe's identity and Protected Subject Matter from the media and public and requires Smith to hold it in confidence and not to disclose it, without Doe's consent. The NDA further provides Doe with the right to sue, entitling him to temporary injunctive relief and other legal and equitable remedies in the event of Smith's breach. Doe's contractual privacy rights cannot be ignored. Within the guaranties of the due process clause of the Fifth Amendment is the "right to contract about one's own affairs." *See Adkins v. Children's Hosp. of the District of Columbia*, 261 U.S. 525, 545 (1923) ("That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause is settled by the decisions of this court and is no longer open to question."). Also granted and protected by the Constitution is the right to sue in court. *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907) ("In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship."). Rather than considering these preeminent rights in its balancing analysis under *Kravetz*, the District Court focused exclusively on the type of information that Doe would "prefer to keep private" (Add. 27) and ignored the fact that Doe's Protected Subject Matter was *already made private* by virtue of Doe and Smith's binding NDA.

The District Court also failed to consider relevant case law that, consistent with *Kravetz*, recognizes the propriety of excluding the media and public from a civil

trial to protect competing contractual and privacy interests. For example, in *Standard & Poors Corp. v. Commodity Exchange, Inc.*, 541 F. Supp. 1273 (S.D.N.Y. 1982), the Southern District of New York found no error in the closure of a civil proceeding during testimony concerning trade secrets, reasoning that "[u]nyielding preservation of the public trial right would…present trade secret owners with the Hobson's choice of suffering an unprosecuted theft of their secrets, or allowing a prosecuted thief to broadcast the same secrets at trial." *Id.* at 1276. As another example, in *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984), the Third Circuit reasoned that sensitive and confidential information, especially in the context of an enforceable confidentiality agreement, could overcome a presumption that proceedings will be open to the public. *Id.* at 1074. Similarly, in *Ospina v. Trans World Airlines, Inc.*, 975 F.2d 35 (2d Cir. 1992), the Second Circuit explained the importance of closing certain parts of the trial to the public at such times as "sensitive, anti-terrorist airline security information was to be disclosed, discussed or evaluated." *Id.* at 36. And, as yet another example, in *In re T.R.*, 556 N.E.2d 439, 455 (Ohio 1990), the Supreme Court of Ohio upheld the closure of trial where intense publicity surrounding a surrogacy case might otherwise have caused psychological harm to the child. Similar to this case, the Ohio court noted that there were arguments in favor of a public trial, including (1) the opportunity to study the potential pitfalls of surrogacy contracts and to resolve the question of whether to

enforce such contracts, and (2) the media's legitimate interest in reporting the details of a newsworthy and emotionally charged story. *Id.* at 452-53. But in balancing "the possibility of psychological harm to [the child] and the threat to a full exploration of the relevant evidence posed by a media-exploited public trial against the public access interests," it found no abuse of discretion in ordering a closure. *Id.*

Had the District Court considered this line of cases, it might have found that Doe's contractual right to protect his personal, confidential information weighed favorably against any public access interests. Instead, the District Court compared this action to a divorce proceeding or custody dispute in which "the intimate financial circumstances of the divorcing couple" are routinely published. Add. 27. Rather than responding to Doe's claim that public access to his highly personal Protected Subject Matter would inflict the very injury he sought to avoid by making and seeking to enforce the NDA, the District Court assessed simply that "the issues Mr. Doe now seeks to keep from the public eye" are at "the heart of this dispute," thereby further justifying  their disclosure to the media and public. Add. 29.

In so doing, the District Court committed a meaningful error of judgment.

**C.     The District Court failed to weigh the nature and degree of injury to Doe, the sensitivity of his Protected Subject Matter, and how the media intends to use his personal, confidential information.**

In balancing the presumptive public right of access against important countervailing interests, the *Kravetz* Court found that a court must weigh "the nature

23

and degree of injury" from public disclosure, taking into consideration "the sensitivity of the information and the subject" and "how the person seeking access intends to use the information." *Kravetz*, 706 F.3d at 62. The District Court failed to engage in that analysis here. Had it done so, it would have found that the sensitive nature of Doe's Protected Subject Matter defeats public access.

It is common knowledge that the public is obsessed with the lottery and those who win it. *See, e.g.,* Charles Trepany, *Powerball sells winning $1.76B ticket. Why are we so obsessed with the lottery?*, USA TODAY, (Oct. 12, 2023). As a result, the notoriety that comes with winning a large jackpot can lead to significant emotional and psychological challenges, risk of exploitation, and relationship stress. *See* Kevin Bennett Ph.D, *The 3 Worst Fears about Winning the Lottery,* PSYCHOLOGY TODAY (June 14, 2023), https://www.psychologytoday.com/us/blog/modern-minds/202306/the-3-worst-fears-about-winning-the-lottery. More dangerously, it can make winners a target of both physical and financial threats. *Id.* For this reason, experts advise that winners remain anonymous. *See The Dangers of Winning the Lottery*, LOTTO ANALYST, https://www.lottoanalyst.com/the-dangers-of-winning-the-lottery.

The District Court seemingly allowed Doe and Smith to proceed pseudonymously at the outset of this case because it recognized that the legitimate danger of harm to the physical, mental, and emotional health of Doe and Daughter

outweighed any public interest favoring identification and open litigation. The District Court's judgment at that time proved to be correct. The media sensationalism surrounding this case began the day after Doe filed his Complaint and has continued right up through the District Court's Order denying the closure of trial. Maine Trust publications have led the way with the following eye-catching headlines: "*Woman says Maine's Mega Millions winner is using lawsuit to pressure her in child custody case*"[4] and "*Maine's 1B lottery winner will have to reveal his identity if privacy case goes to trial.*"[5] Over 60 newspaper articles, TV segments, and YouTube videos have followed suit, with clickbait titles such as "*Billion-Dollar Mega Millions Winner Sues Baby Mama for Telling Fam about Payout – Rich Guy Problems*"[6] and "*Mega Millions winner sued by family for breaking promise to*

---

[4] Emily Allen, *Woman says Maine's Mega Millions winner is using lawsuit to pressure her in child custody case*, PORTLAND PRESS HERALD (February 8, 2024), https://www.pressherald.com/2024/02/08/woman-says-maines-mega-millions-winner-is-using-lawsuit-to-pressure-her-in-child-custody-case/.

[5] Emily Allen, *Maine's 1B lottery winner will have to reveal his identity if privacy case goes to trial*, PORTLAND PRESS HERALD (April 15, 2025), https://www.pressherald.com/2025/04/15/maines-1b-lottery-winner-will-have-to-reveal-identity-if-privacy-case-goes-to-trial.

[6] Justin Rohrlich, *Billion-Dollar Mega Millions Winner Sues Baby Mama for Telling Fam about Payout – Rich Guy Problems*, THE DAILY BEAST (November 15, 2023, at 5:52 EST), https://www.thedailybeast.com/dollar135-billion-mega-millions-winner-sues-baby-mama-for-telling-fam-about-payout/

*share $1.35B jackpot.*"[7] Barstool Sports – with a current Instagram follower count of 17 million – has offered perhaps the most sensationalized and emotionally-charged take on the case:

> There are so many things I want to know about this family. There's a juicy story in there somewhere. For one, how much does this man HATE his parents...And how much does he HATE the mother of his child? To go through with filing a lawsuit that is likely crippling to her, for an amount of money he wouldn't hesitate to wipe his ass with…I have to assume this man has enemies...The type of people who will actively hunt him down and kill him for his money. Maybe those enemies are his parents. Or maybe he just fucking loves the legal system[] and stands for the sanctity of non-disclosure agreements. We need to find out. Somebody needs to get a hold of his baby mama to get the full story. His secrets [sic] already out at this point. And we know she has a big mouth. Someday she's going to spill the beans."

John Rich, *$1.35 Billion Dollar Mega Millions Winner is Suing The Mother of His Child for Pennies*, BARSTOOL SPORTS (November 17, 2023, at 11:30 AM), https://www.barstoolsports.com/blog/3493730/dollar135-billion-dollar-mega-millions-winner-is-suing-the-mother-of-his-child-for-pennies.

Given the nature of media coverage to date, it is axiomatic that allowing public access to any trial in this case will -- as *Kravetz* and *Amodeo* cautioned against -- "cater to a morbid craving for that which is sensational and impure." *See Kravetz*,

---

[7] Steve Janoski, *Mega Millions winner sued by family for breaking promise to share $1.35B jackpot*, NEW YORK POST, (May 14, 2024, at 12:40 ET), https://nypost.com/2024/05/14/us-news/mega-millions-jackpot-winner-sued-by-family-for-breaking-promise-to-share-1-35-billion-prize-report/.

706 F.3d at 63 (quoting *Amodeo*, 71 F.3d at 1051). Highly personal evidence about Doe, his Protected Subject Matter, relationships, and communications – whether true, false, and/or hyperbolic -- will be circulated and accessed rapidly on the Internet, simply because of Doe's status as a billion-dollar lottery winner. As the *Nixon* Court observed, a district court has the power to ensure that the common-law right of access not be used as a vehicle to promote scandal. *See Nixon*, 435 U.S. at 598. Here, the District Court should have taken into account how the media would use Doe's information and how this massive assault on the privacy of Doe and Daughter – two private figures – will likely cause them harm. Instead, it treated this case as just another routine divorce case or custody proceeding. Finally, it concluded, without analysis, that the Supreme Court's observations in *Richmond Newspapers* about the role of the press in monitoring *criminal* trials somehow justify extending the right of access to this *civil* case. For these reasons, the District Court committed a meaningful error of judgment.

> **D.    The District Court improperly relied on its apparent belief that Doe seeks to weaponize the NDA in the broader context of a custody dispute with Smith.**

As the District Court acknowledged in its Order, non-disclosure agreements are "not disfavored under Maine law." Add. 30. In fact, a non-disclosure agreement is a "legally binding contract that establishes a confidential relationship between two parties: one that holds sensitive information and the other that will receive that

sensitive information. The latter agrees that the information they receive won't be made available to others." Alexandra Twin, *Non-Disclosure Agreement (NDA) Explained, With Pros and Cons*, INVESTOPEDIA (May 15, 2025) https://www.investopedia.com/terms/n/nda.

Nevertheless, the District Court proceeded to take issue with non-disclosure agreements outside of the trade secret or business context, asserting that "[i]n some contexts, NDAs have more recently become controversial." Add. 30.  In support of its premise, the District Court cited a student law review article entitled, "*Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Regulation*." *Id.*  Significantly, that law review article addressed the improper weaponization of NDAs in cases of sexual assault and sexual harassment to conceal misconduct and shield perpetrators like Harvey Weinstein from consequences. *See* Shinners, *supra*. Yet, the District Court did not distinguish the "weaponized NDAs" described in the article from the NDA in this case in which the Protected Subject Matter pertains *solely* to Doe and *not* to Smith. Instead, it proceeded to cite *Board of Overseers of the Bar v. Carey*, 2019 ME 136, 215 A.3d 229 (2019), an inapposite Maine Law Court case in which the court imposed discipline upon an attorney who sexually harassed a female and entered into a NDA with her to silence her as a potential witness against him. Add. 30-31.  It also cited First Circuit cases in which the NDAs in question were not enforceable.  Add. 30.

The District Court then posited, "[h]ow Maine law should treat the NDA in the instant case, a non-business agreement designed to keep a former intimate partner from revealing wealth in the broader context of a custody dispute, is a legitimate matter of public concern." Add. 31. Although the statement was made in the context of the public's "right to understand how and why the Court rules on this matter" (*id.*), the implication is that Doe is improperly weaponizing his NDA with Smith to gain leverage over her in their custody dispute.

The District Court's analysis is erroneous for a number of reasons. First, although there is a contested custody matter pending between Doe and Smith concerning Daughter, the District Court incorrectly assumed that the NDA allegations are in "the broader context of contested custody litigation in state court" when in fact the parties entered into their NDA *before* Smith brought a custody dispute against Doe.  Second, it improperly suggested that the parties' NDA may be deemed unenforceable by virtue of it being a non-business agreement between former "intimate partners" that prevented Smith from disclosing Doe's identity as a lottery winner. Id. Third, it suggests that the District Court may have based its decision on misplaced sympathy for Smith as the silenced victim of a weaponized NDA.

**E.     The District Court improperly relied on the straw man fallacy that "a party's wealth alone is not a legitimate reason to restrict the right of public access."**

The District Court further erred by incorrectly determining that "one of Mr. Doe's main points is that because he is now wealthy, the consequences of his filing this lawsuit are different for him as opposed to less financially fortunate individuals. He fears his new-found wealth will make him the target of an inquisitive and occasionally malevolent people." Add. 32. *Nowhere* in Doe's filings does he claim that a trial in this case should be closed *because* of his wealth. Certainly, wealth is intertwined in this case insofar as Doe does not want to be "outed" as a lottery winner.  But to be clear, Doe claims that a trial should be closed because public access would otherwise moot the parties' NDA – which prohibits the disclosure of Doe's identity and information relating to his wealth -- and Doe's lawsuit to enforce the NDA.

The District Court's citation to Doe's Motion to Proceed Under Pseudonym is inapposite. *See id.* In the context of arguing that party pseudonymity was appropriate, Doe's Motion examined, among other things, the second factor of the pseudonymity test articulated in *Does v. Mills*, No. 1:21-cv-00242-JDL, 2022 WL 1747848, at *2-3 (D. Me. May 31, 2022) – the bases upon which disclosure is feared and sought to be avoided, and the substantiality of these bases – and stated:

> There are unique risks inherent to being an ultra-high-net worth individual, especially where, as here, the individual's increase in wealth is swift and

dramatic. Plaintiff has had to hire a highly respected security firm and strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy.

Add. 53.  That statement explained why Doe's concern for his and Daughter's safety was valid. The District Court misapplied the statement to mean that it need not close the trial as Doe is rich enough to hire security and "mitigate[] the impact of the public revelation of his new financial status." Add. 32.

Although the District Court correctly observed that federal judges take an oath to "do equal right to the poor and to the rich" (Add. 32-33), the District Court seemingly denied Doe's Motion for closure of trial *because he is rich*. It ignored the fact that Doe brought suit to enforce the parties' NDA and to prevent the irreparable harm of disclosure to the media and the public and ruled instead that Doe is rich enough to mitigate the harm from any such disclosure. In so doing, the District Court abused its discretion.

## III.    The District Court erred in denying Doe's Motion to maintain pseudonyms for the parties and their family members through trial.

In its pseudonym analysis, the District Court correctly cited the "totality of the circumstances" standard set forth by the *MIT* Court but then failed to properly apply it. Specifically, the District Court improperly: (1) limited its assessment to the *MIT* paradigms and ignored other relevant circumstances in the case; (2) assessed only two of three relevant paradigms warranting pseudonymity; (3) assessed the two

paradigms separately without considering their weight jointly; (4) concluded that "Doe's dilemma is one of his own making" because he chose to litigate instead of engaging in arbitration or mediation; (5) dismissed Doe as one of many "rich and famous persons" who prefer not to have their court cases litigated in public; and (6) based its decision on the fact that Doe is wealthy enough to mitigate any harm to his safety and privacy.  Although a district court enjoys "broad discretion to quantify the need for anonymity in the case before it," this Court should reverse the District Court's decision to deny continued pseudonymity where it plainly committed a "meaningful error of judgment." *See Doe v. Town of Lisbon*, 78 F.4th 38, 45 (1st Cir. 2023) (setting forth the standard of review of pseudonym decisions).

## A.    The *MIT* "totality of the circumstances" test

In *MIT*, this Court recognized that, although there is a strong presumption against the use of pseudonyms in civil litigation, their use is warranted in exceptional cases. 46 F.4th at 70 (citing *Mills*, 39 F.4th at 25).  "That is because lawsuits in federal courts frequently invade customary notions of privacy and – in the bargain – threaten parties' reputations." *In re Exch. Union Co.*, No. 24-mc-91645-ADB, 2025 WL 894652, at *4 (D. Mass. Mar. 24, 2025) (allowing intervenor pseudonymity where court would otherwise let "cat out of the bag" and render forthcoming motion to quash moot).

To determine whether a case is "exceptional," a district court must apply a "totality of the circumstances" test. *MIT*, 46 F.4th at 72. The *MIT* Court identified four paradigmatic situations in which proceeding under a pseudonym is appropriate: (1) where a would-be Doe reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological); (2) where identifying the would-be Doe would harm "innocent non-parties;" (3) where anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated; and (4) where a suit is bound up with a prior proceeding made confidential by law. *Id.* at 71. The *MIT* Court made clear, however, that these four "paradigms" are non-exhaustive "rough cuts" and that "it is possible that a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated." *Id.* at 72. The Court subsequently articulated in *Doe v. Town of Lisbon* that "these categories are designed to provide guidance to district courts in "balancing the interests asserted by the movant in favor of privacy against the public interest in transparency, *taking all relevant circumstances into account*." *Town of Lisbon*, 78 F.4th at 46 (emphasis added).

Accordingly, district courts applying the "totality of the circumstances" test in this Circuit have recognized that they must consider as a whole the circumstances of a movant's claims, including and *independent of* the four *MIT* paradigms. *See Doe*

*v. Buckingham Browne & Nichols Sch.*, No. 25-10176-FDS, 2025 WL 1314250, at *1 (D. Mass. Apr. 9, 2025) (considering as a whole the circumstances of movant's claims for reasons independent of paradigms to allow movant to proceed under pseudonym); *Doe v. Trustees of Boston Univ.*, No. 24-10619-FDS, 2024 WL 4700161, at *5 (D. Mass. Nov. 6, 2024) (balancing relevant interests where the four *MIT* paradigms were "important guides" but additional factors ultimately favored permitting the use of a pseudonym).

### B.    The District Court failed to consider all relevant circumstances.

The District Court did not take into account all relevant circumstances in its pseudonym analysis. Specifically, it failed to consider and address that: (1) the NDA at the heart of this litigation prohibits the disclosure of Doe's identity, and that therefore the denial of continued pseudonymity will inflict the very injury Doe sought to avoid by entering into the NDA; (2) Smith will suffer no prejudice as Doe seeks to maintain the pseudonyms of both parties and their family members; (3) Doe and Smith have consistently used pseudonyms throughout this case and prefer to do so; (4) the actual identities of Doe, Smith, and their family members will have no bearing on the outcome of this case; and (5) no circumstances have changed in the litigation to justify the termination of pseudonymity.

### 1.    No consideration of the NDA

The District Court ignored the fact that the NDA prohibits the disclosure of Doe's identity and highly private information relating to the "existence" of his family members.  Specifically, the NDA states that disclosure of this Protected Subject Matter could cause irreparable harm if discovered by members of the media or the public, and it entitles Doe to pursue temporary injunctive relief and other legal and equitable remedies in the event of disclosure.  As stated *supra*, Doe's right to contract is rooted in the Fifth and Fourteenth Amendments to the U.S. Constitution. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (liberty denotes the right of an individual to contract); *Allgeyer v. Louisiana*, 165 U.S. 578 (1897) (liberty embraces the right of a citizen to enter into all contracts which may be proper, necessary and essential to his enjoyment or livelihood). Yet, the District Court failed to consider and address this right and the fact that termination of pseudonymity will cause Doe to sustain the very injury he sought to avoid by contract.

### 2.    No consideration of the lack of prejudice

The District Court similarly failed to consider the complete lack of prejudice to Smith. *Cf. Doe v. Noem*, No. 1:25-cv-10495-IT, 2025 WL 990635, at * 2 (D. Mass. Apr. 2, 2025) (considering minimal degree of prejudice to defendants in decision to grant pseudonymity); *Trs. of Bos. Univ.*, 2024 WL 4700161, at *5 (same). Weighing heavily in favor of continued pseudonymity is the fact that: (1)

both Doe and Smith would proceed under pseudonym; (2) Doe and Smith know each other's identities and those of their relevant family members and would suffer no prejudice; and (3) Smith too would benefit from continued pseudonymity and has acknowledged in her opposition to Doe's Motion that she "would certainly prefer to maintain her anonymity." *Cf. Doe v. Colgate Univ.,* No. 5-15-cv-1069, 2016 WL 1448829, at *3 (N.D.N.Y. Apr. 12, 2016) (allowing plaintiff pseudonymity where there was no prejudice to defendants, they were aware of plaintiff's true identity, and they would have an uninhibited opportunity to litigate the matter regardless of whether plaintiff's identity was disclosed publicly). The District Court should have weighed and addressed in its analysis the lack of prejudice -- and actual benefit -- to Smith.

### 3.    No consideration of the parties' consistent use of pseudonyms

The District Court also failed to consider the extent to which the identities of the parties and their relevant family members have been kept confidential to date. *Cf. Jakuttis v. Town of Dracut, Massachusetts*, 656 F. Supp. 3d 302, 350-51 (D. Mass. 2023) (considering parties' inconsistent use of pseudonyms and failure to file under seal in decision to deny pseudonymity). Weighing heavily in favor of continued pseudonymity is the fact that Doe and Smith have consistently kept anonymous their and their relevant family members' identities, throughout this action. To the extent they may have revealed details regarding each other in court

filings, "there is a substantial difference between disclosing unique aspects of one's identity in court filings and disclosing one's actual name." *Trs. of Bos. Univ.*, 2024 WL 4700161, at *6. Certainly, any attempt by the media and public to deduce their identities from certain unredacted court filings would not be as definite or as damaging as identification by name. *See id.* Yet, the District Court did not factor into its analysis the parties' consistent use of pseudonyms in this case.

> **4.    No consideration that actual identities will have no bearing on the outcome of the case and are of minimal interest to the public**

The District Court further failed to consider the extent to which the actual identities of the parties and their relevant family members will have bearing on the outcome of this case or are of interest to the public. *Cf. id.* at *5 (considering public's minimal interest in identity of plaintiff and "no great risk" to judicial system in decision to grant pseudonymity); *Malibu Media, LLC v. Doe*, No. 15-cv-2624-ER, 2015 WL 6116620, at *5 (S.D.N.Y. Oct. 16, 2015) (weighing minimal public interest in disclosing defendant's name against his interest in remaining anonymous); *Doe v. State of Alaska*, 122 F.3d 1070 (9th Cir. 1997) (allowing pseudonymity where issues raised were purely legal and none of values protected by public access would be hindered). Weighing heavily in favor of continued pseudonymity is the nature of Doe's claims – he seeks to enforce a personal NDA involving sensitive information unique to him. In its denial of Doe's Motion for closure, the District Court stated

that "[t]he public has a right to understand" (Add. 31) how Maine law should treat the NDA in this case. Yet the District Court did not address why the actual identities of the parties and their relevant family members are central to the public's interest in the case. *Cf. Trs. of Bos. Univ.*, 2024 WL 4700161, at *5 (public interest in plaintiff's identity deemed not significant in case involving disputed interpretation and application of internal university protocols). Given the facts, Doe submits that his contractual interest in remaining anonymous far outweighs any minimal value to the public in knowing his actual name. *See* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353, 1378 (2022) (weaker presumption against pseudonymity where topics are private or issues raised are purely legal).

### 5. No analysis of what change in circumstances now justifies terminating pseudonymity

Further, the District Court failed to address what change in circumstances now justifies terminating pseudonymity. Certainly, a district court may reevaluate a grant of pseudonymity "if and when circumstances change." *MIT*, 46 F.4th at 73; *see also Doe v. U.S. Sec'y of State*, 707 F. Supp. 3d 142, 145 (D.N.H. 2023) ("Either party may file a motion to vacate this [pseudonymity] order if Doe's circumstances change such that anonymity may no longer be appropriate"). However, no circumstances have changed in this case apart from Doe's Motion and the District Court's decision to permit a public trial. The public trial ruling, in and of itself, does not require the parties to proceed under their real names, absent a separate analysis by the court. *See*

*MIT*, 46 F.4th at 73 (citing E.D.N.Y. case of *Lawson v. Rubin* for its analysis of why a pseudonymous party *might* be required to proceed under their real name at trial). A public's right to attend trials and the public's right to know the identity of the parties are not perfectly symmetrical. *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981) ("crucial interests served by open trials are not inevitably compromised by allowing a party to proceed anonymously"). "Plaintiffs should not automatically be forced to choose between asserting their substantive rights in court and thereby forfeiting their privacy or security interests, and foregoing their substantive rights as the price of preserving their privacy or security." Joan Steinman, *Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted to Keep their Identities Confidential?,* 37 HASTINGS L.J. 1, 33 (1985). Yet, the District Court did not address what circumstances have changed in this case to render pseudonymity inappropriate.

Because of its failure to consider relevant circumstances weighing heavily in favor of continued pseudonymity, this Court should vacate the District Court's decision denying continued pseudonymity.

### C.    The District Court failed to properly assess the three relevant paradigms warranting pseudonymity.

In limiting its "totality of the circumstances" analysis to the *MIT* paradigms, the District Court found that only the first and second of three relevant paradigms apply to this case: "Doe's fears of severe harm from disclosure and his concern of harm to his daughter, an innocent third party." It then analyzed the first and second

paradigms separately and concluded that neither fits this case within the narrow group of exceptional cases where anonymity should be allowed. It did not consider or address the third paradigm involving cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated. In so doing, the District Court committed a meaningful error of judgment.

### 1.    Doe's case fits solidly within the first paradigm.

The first *MIT* paradigm involves a litigant who "reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)." *MIT*, 46 F.4th at 71. Doe fits solidly within that paradigm. He credibly alleged that, if his identity were to be publicized in open court, the public and media's demonstrated unhealthy obsession with the lottery and lottery winners would subject him to the undue risk of: (1) kidnap for ransom; (2) stalking and harassment; (3) unwanted attention on his minor daughter at school, by her friends, and by other individuals associated with her; (4) increased attention on Doe's other family members; (5) cybersecurity vulnerabilities; (6) impersonation and financial fraud; (7) media attention; (8) extortion; (9) solicitation of services or for financial support; and (10) disruptions and restricted movement in daily life. Add. 53. He also maintained that, since the filing of this lawsuit, he has had to meet with a therapist weekly to deal with feelings of isolation and anxiety. *Id.* Significantly, neither the District Court nor any party disputed or attempted to minimize Doe's fears. The

District Court's only response was that many rich and famous people could be subject to the same risks. Add. 36. Nevertheless, courts in this Circuit have found that the *reasonable* threat of physical or psychological harm justifies pseudonymity. *Cf. Doe v. Del Toro*, No. 1:23-cv-13112-JEK, 2024 WL 816511, at *2 (D. Mass. Feb. 27, 2024) (case fits within first paradigm where disclosure of name would inhibit ongoing recovery and trigger serious mental health risks); *see also Doe v. Del Rio*, 241 F.R.D. 154, 161 (S.D.N.Y. 2006) (psychological harm may justify pseudonymous litigation); *Doe v. Smith*, 105 F. Supp. 2d 40, 44 (E.D.N.Y. 1999) (threats to mental health sufficient to justify pseudonymous proceedings); *Doe v. Amherst Cent. Sch. Dist.*, 196 A.D.3d 9 (N.Y. App. Div. 2021) (sexual abuse plaintiff who alleged emotional distress and psychological damages that would recur if her name was publicized allowed to proceed by pseudonym even though allegations not supported by expert medical testimony). Accordingly, Doe's case fits solidly within the first paradigm, and the District Court erred in ruling otherwise.

### 2.    Doe's case fits solidly within the second paradigm.

The second *MIT* paradigm involves cases where identifying Doe would harm innocent non-parties, as they have a "stronger case for anonymity" than even the parties. *See MIT*, 46 F.4th at 71.

Here, Doe argued that disclosing his and Smith's actual names would lead to the collateral identification of Daughter and cause her significant harm. He

referenced the language of the NDA – which prohibits the disclosure of his identity for his minor daughter's sake -- and his Motion to Proceed Under Pseudonym, as credible evidence of the undue risks his daughter faces, including kidnap for ransom, stalking and harassment, cybersecurity vulnerabilities, and unwanted media attention. Add. 51-61. Again, the District Court did not dispute or attempt to minimize Doe's fears for Daughter.  Nevertheless, it ruled that it would terminate pseudonymity and henceforth identify Doe's daughter by her initials on the grounds that "Doe has provided no evidence to conclude that if his name were revealed, her privacy would be in jeopardy." Add. 37. In so ruling, the District Court ignored Doe's list of significant risks that influenced it to grant pseudonymity in the first place. It also failed to consider the sensationalized media attention that this case has already garnered and the fact that it will be "child's play" for the media and public to identify the parties' minor daughter, despite her identification by initials only. *See* Volokh, *supra*, at 1364 (acknowledging that "[e]ven if a minor's name is abbreviated…it might not be hard for people to identify [the minor] based on her [parent's] name.").

Although lawsuits often involve revealing the identities of innocent non-parties, pseudonymity is appropriate to protect those non-parties where, as here, there is a "substantial risk apart from the risk of disclosure." *See Buckingham Browne,* 2025 WL 1314250, at *1 (allowing pseudonymity under second paradigm

requires assertion that children are likely to suffer harm if others find out about lawsuit); *Doe v. Doe*, No. 20-cv-5329-KAM-CLP, 2020 WL 6900002, at *3 (E.D.N.Y. Nov. 24, 2020) (allowing pseudonymity where party's former spouse and minor child are innocent third parties who would be vulnerable to mental harm if party's name is disclosed). Here, the substantial risk of physical and psychological harm to the parties' minor daughter only bolsters the case for keeping their identities concealed.  As such, Doe's case fits solidly within the second paradigm.

### 3.    Doe's case fits solidly within the third paradigm.

The third paradigm "involves cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated." *MIT*, 46 F. 4th at 71.  The *MIT* Court specifically cited as examples cases "in which the injury litigated against would be incurred as a result of the disclosure of the party's identity." *Id.*

### a.    Chilling effect on Doe

Here, Doe's case unquestionably fits within the third paradigm. Doe brought suit to enforce the NDA for fear that disclosure of his identity to the public and media would cause irreparable harm to his and Daughter's safety and privacy. If he, Smith, Daughter, and their family members are now identified in this litigation, his identity as the winner of the billion-dollar lottery will be widely disseminated by the media, causing him and Daughter to incur the very injury he litigated against. *Cf. In re Exch.*

*Union Co.*, 2025 WL 894652, at *4 (allowing pseudonymity of intervenors where disclosure of their names was one of the harms sought to be prevented by intervention); *Patrick Collins, Inc. v. Does 1-38*, 941 F. Supp. 2d 153, 161 (D. Mass. 2013) (allowing pseudonymity in case challenging subpoenas for very purpose of protecting personal identifying information from disclosure); *Trs. of Bos. Univ.*, 2024 WL 4700161, at *4 (allowing pseudonymity where requiring plaintiff to disclose identity to keep sexual misconduct accusations out of broader public realm would discourage resort to courts); *Orr v. Trump*, No. 1:25-CV-10313-JEK, 2025 WL 848691, at *2 (D. Mass. Mar. 18, 2025) (allowing pseudonymity where requiring plaintiff to disclose transgender identity would have chilling effect on future transgender litigants due to risk of discrimination or violence); *U.S. Sec'y of State*, 707 F. Supp. 3d at 144 (allowing pseudonymity where other persons in Doe's situation would be dissuaded from seeking legal relief were his identity revealed as Afghani national who aided U.S. military efforts).

Those legal scholars who have written on the law of pseudonymous litigation recognize that proceeding pseudonymously is essential in cases such as this involving intensely personal subject matter, as many plaintiffs would forego litigating meritorious claims rather than risk public disclosure of their names or other sensitive personal information. *See* Benjamin P. Edwards, *When Fear Rules in Law's Place: Pseudonymous Litigation as a Response to Systematic Intimidation*, 20 VA.

J. Soc. Pol'y & L. 437, 472 (2013) ("The ever-increasing loss of privacy in today's society, due to modern technology, should be offset by permitting more plaintiffs with meritorious privacy concerns to proceed anonymously."); Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. Kan. L. Rev. 195, 253 (2004) ("An essential goal of the judicial system should be to remain an accessible institution for the public. In light of this, courts must recognize that plaintiffs might be compelled to choose to forego their actions for fear of having their privacy violated"); Volokh, *supra*, at 1395 ("In most cases where denying pseudonymity can harm parties (whether through harming privacy or reputation or otherwise), denying pseudonymity can also undermine the public policy that the civil causes of action are aimed to serve. Underlying causes of action…may end up being underenforced, and useful precedent may end up being underproduced").

The District Court should have evaluated whether Doe's case fits within the third paradigm. It erred by not doing so and by failing to determine whether denial of Doe's Motion to continue under pseudonyms would in effect constitute denial of access to the judicial system for him and similarly situated litigants.

As a practical matter, if the Order is affirmed as to the denial of continued pseudonymity to Doe, Smith, Daughter, and relevant family members, Doe will likely be forced to drop his action rather than jeopardize his and Daughter's privacy

and safety. Ironically, Smith seems to oppose continued pseudonymity for this very reason. Had the District Court properly exercised its discretion to allow continued pseudonymity at trial, Doe would not be in this no-win position. *Cf. James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993) (practical result of abuse of discretion is to cut off a claim, a "great civil wrong" where plaintiffs take reasonable position that they will not proceed except under pseudonyms).

### b.    Chilling effect on similarly situated future plaintiffs

If the District Court's pseudonym ruling stands, not only Doe but similarly situated future plaintiffs will have to ask themselves if it is worth risking their privacy, confidentiality, and safety to enforce a personal NDA in court. Many will "walk away," regardless of whether their claims are meritorious, resulting in their disenfranchisement from the judicial process.  Moreover, "[p]otential defendants will continue to act improperly since the threat of a lawsuit, normally a deterrent to bad behavior, will be absent." Jayne S. Ressler, *#Worstplaintiffever: Popular Public Shaming and Pseudonymous Plaintiffs*, 84 TENN. L. REV. 779, 825-26 (2017). Courts themselves may lose their power to ensure faith in the judicial system. "After all, courts cannot hear cases that plaintiffs do not file." Edwards, *supra*, at 472.

### c.    No "opening of the floodgates"

Any concern that allowing continued pseudonymity in this case might "open the floodgates" in all cases involving the disclosure of private facts is misplaced.

This is not the typical case where plaintiffs who happen to be rich and famous seek anonymity to protect their privacy and reputational interests as they seek redress against defendants. *Cf. Doe v. MaineGeneral Med. Ctr.,* No. 1:24-cv-00220-NT, 2024 WL 3967172, at * 1 (D. Me. Aug. 28, 2024) (damage to professional reputation not enough to warrant pseudonymity in discrimination case); *Does v. Mills*, 2022 WL 1747848, at *4 (risk of social stigma not enough to warrant pseudonymity in case challenging COVID vaccine mandate); *Doe v. W. New England Univ.*, No. 3:19-30124-TSH, 2019 WL 10890195, at *1 (D. Mass. Dec. 16, 2019) (potential humiliation or economic harm relating to mental health disorders not enough to warrant pseudonymity in contract and tort case). Rather, it is that rare breach of contract case in which preventing disclosure of identity to the media and public is the *sole* basis of the lawsuit.  As such, the District Court erred by failing to consider the fact that the injury litigated against – the public disclosure of Doe's identity -- would be incurred upon denial of his right to proceed pseudonymously through trial.

### 4.     Doe's case implicates multiple paradigms.

Because the first, second, and third *MIT* paradigms are implicated here, the District Court should have analyzed whether, on the whole, Doe ultimately made a persuasive showing for pseudonymity. *See MIT*, 46 F.4th at 72 ("It is possible that a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms

are implicated."); *Trs. of Bos. Univ.*, 2024 WL 4700161, at *4 (allowing pseudonymity where case had at least a foothold in all four paradigms). In failing to do so, it committed a meaningful error of judgment.

**D.    The District Court relied on the improper determination that "Doe's dilemma is of his own making" because he chose to enforce the parties' NDA in court instead of engaging in confidential arbitration or mediation.**

The District Court further erred by basing its pseudonym ruling on the improper determination that "Doe's dilemma is of his own making" because he chose to enforce the parties' NDA in court instead of engaging in confidential arbitration or mediation. "Individuals have a constitutional right of access to the courts, which includes a right to be heard on the merits of their claims." Steinman, *supra,* at 33 n.145; *see also Chambers*, 207 U.S. at 148 (right to sue is among privileges and immunities protected by article IV, section 2, para. 1 and the 14th Amendment to the Constitution); 8 C. WRIGHT & A. MILLER FEDERAL PRACTICE AND PROCEDURE § 2018, at 145 ("constitutional right to bring an action"); *Doe v. Bodwin*, 119 Mich. App. 264, 266-70, 326 N.W.2d 473, 474-76 (1982) (rejecting trial court's conclusion that plaintiff waived anonymity by filing suit, holding that trial court had discretion to allow pseudonymous litigation, relying in part on plaintiff's constitutional right to privacy and access to the courts).

Doe should not have been forced to choose between: (1) asserting his substantive right to sue in court and thereby forfeiting his privacy and security; and

(2) foregoing his substantive right to sue in order to protect his privacy and security. This "either-or" approach interferes with his constitutional right to enforce his claims in court. *See* Steinman, *supra*, at 34. Yet, the District Court's decision implies that Doe waived his right to proceed under pseudonym by seeking to enforce his NDA in court. The result is an Order that unfairly prioritizes the public's interest in knowing Doe's identity over his claim that he is entitled to confidentiality under the parties' NDA. *See id.*

The District Court's determination that Doe should have engaged in confidential arbitration is similarly faulty. As a practical matter, simply executing a confidentiality agreement does not guarantee that arbitration proceedings will remain confidential. Numerous courts have found that an agreement to keep the arbitration confidential is no longer controlling if an aspect of the arbitration is challenged in court. *See Jankula v. Carnival Corp.*, No. 18-cv-24670-UU, 2019 WL 8051719, at *2 (S.D. Fla. Sept. 5, 2019) (when party asks court to rule on arbitration, they choose forum to which public has presumptive right of access); *Jackson v. Sleek Audio, LLC*, No. 13-80725-CIV-MARRA, 2013 WL 12384284, at *1-2 (S.D. Fla. Oct. 8, 2013) (agreement to keep arbitration confidential no longer controlling in court challenge to arbitration award); *Bernsten v. O'Reilly*, 307 F. Supp.3d 161, 168 (S.D.N.Y. 2018) (confidentiality agreement alone does not provide adequate basis for sealing papers related to arbitration).

Accordingly, the District Court's statement that Doe created this so-called dilemma indicates that it did not exercise proper discretion in making its pseudonym decision.

### E.    The District Court improperly denied Doe's Motion for pseudonymity based on his wealth.

Finally, the District Court erred in its pseudonym decision by: (1) dismissing Doe as one of an "entire tier of rich and famous persons… [who] prefer not to have the court cases litigated in public" (Add. 36); and (2) downplaying Doe's fears of harm with the statement: "great wealth comes with the financial capacity to afford enhanced security and privacy" (*id.*). As stated *supra*, Doe does not seek pseudonymity because he is wealthy but because he has the substantive right to enforce his NDA in court and prevent the disclosure of his identity and personal information. Certainly, Doe's fears should be considered no less reasonable under the first *MIT* paradigm because he is wealthy enough to afford security.

As the District Court noted, "Congress requires each federal judge to "administer justice without respect to persons, and do equal right to the poor and to the rich." Add. 32-33. To the extent its pseudonym decision took into account Doe's wealth, it committed a meaningful error of judgment. *See People ex rel. Union Bag & Paper Corp. v. Gilbert*, 256 N.Y.S. 442, 444 (Sup. Ct. 1932) ("Every litigant is entitled to nothing less than the cold neutrality of an impartial judge who must

possess the disinterestedness of a total stranger to the interests of the parties involved in the litigation . . . .").

For all of the foregoing reasons, this Court should reverse the District Court's denial of continued pseudonymity through trial.

## **CONCLUSION**

For the reasons stated above, Doe respectfully requests that this Court: (1) vacate the District Court's Order denying Doe's Motion for closure of trial; (2) vacate the District Court's Order denying Doe's Motion for continued pseudonymity; (3) remand the case to the District Court for further proceedings consistent with this Court's opinion; and (4) grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Plaintiff-Appellant,
JOHN DOE,

By his attorneys,

*/s/ Louise M. Aponte*
 Gregory Brown (No. 1212935)
 Louise M. Aponte (No. 1212800)
 LOWE YEAGER & BROWN PLLC
 920 Volunteer Landing, Suite 200
 Knoxville, Tennessee 37915
 (865) 521-6527

and

Stephen B. Segal (No. 1188949)
VERRILL DANA LLP
One Portland Square
Portland, Maine 04101
(207) 774-4000

Dated: August 4, 2025

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,570 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2507 (2025) in 14-point Times New Roman typestyle.

*/s/ Louise M. Aponte*
Louise M. Aponte

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed with the Circuit Clerk using the CM/ECF system on this 4th day of August, 2025. Notification of this filing was sent to all parties registered with the Court's electronic filing system.

*/s/ Louise M. Aponte*
Louise M. Aponte

**ADDENDUM**

**TABLE OF CONTENTS**

| Document | Page |
|---|---|
| Table of Contents | Add. 1 |
| Order on Motion for Closure of Trial | Add. 2 |
| Nondisclosure Agreement | Add. 42 |
| Motion for Leave to Proceed Under Pseudonym and for Protective Order, and Memorandum in Support | Add. 51 |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHN DOE,                          )
                                   )
            Plaintiff,             )
                                   )
    v.                             )          No. 2:23-cv-00423-JAW
                                   )
SARA SMITH,                        )
                                   )
            Defendant,             )
                                   )
MAINE TRUST FOR LOCAL              )
NEWS, L3C, *d/b/a Portland Press*  )
*Herald/Maine Sunday Telegram*,    )
                                   )
            Intervenor.            )

## ORDER ON MOTION FOR CLOSURE OF TRIAL

Consistent with this circuit's well-established precedent on the right of public access to civil proceedings, the court denies a plaintiff's motion for a closed trial and for testimony by pseudonym at such a trial.

## I.    PROCEDURAL BACKGROUND

On November 14, 2023, John Doe, a pseudonym for the father of a minor daughter, filed a lawsuit against Sara Smith, a pseudonym for the mother of the same minor, seeking an injunction and other relief against Ms. Smith for disclosure of information subject to a Non-Disclosure Agreement (NDA) between them. *Compl.* (ECF No. 1). Specifically, Mr. Doe, a winner of the Maine State Lottery, claimed that Ms. Smith violated the NDA by informing third parties about his winnings. *Id.* at 4-5.

After the parties proceeded with discovery, trial was scheduled to commence on April 1, 2025. *Trial List* (ECF No. 178). On February 7, 2025, Mr. Doe moved for a closed trial. *Pl.'s Mot. for Closure of Trial* (ECF No. 179) (*Pl.'s Mot.*). His motion preemptively informed the Court that he intended to seek interlocutory appeal of the issue of closure. *Id.* at 1 & n.1. Ms. Smith opposed the Plaintiff's motion on February 28, 2025. *Def.'s Br. in Opp'n to Pl.'s Mot. for Trial Closure* (ECF No. 195) (*Def.'s Opp'n*). Maine Trust for Local News, L3C d/b/a Portland Press Herald/Maine Sunday Times (Maine Trust), an intervenor in this suit, submitted its opposition to the Plaintiff's motion on the same date. *Opp'n to Pl.'s Mot. for Closure of Trial, by Intervenor Me. Trust for Loc. News* (ECF No. 196) (*Intervenor's Opp'n*). On March 14, 2025, the Plaintiff replied separately to the Defendant's opposition, *Pl.'s Reply to Opp'n by Def.* (ECF No. 203) (*Pl.'s Reply to Def.*), and the Intervenor's opposition, *Pl.'s Reply to Opp'n by Intervenor* (ECF No. 204) (*Pl.'s Reply to Intervenor*).

## II. THE PARTIES' POSITIONS

### A. The Plaintiff's Motion

Mr. Doe notes the Court "hit the nail on the head" when it observed in a January 10, 2025 status conference that he is faced with a "Catch-22" if this case were to proceed to a public trial: "even if Plaintiff were to win on his claims, his identity and confidential information would be revealed to the public and the media; he would effectively lose the privacy war and subject himself and his minor daughter to the irreparable harm he brought suit to avoid." *Pl.'s Mot.* at 1; *see also Min. Entry* (ECF No. 174). He thus files this motion for a closed trial and informs the Court of his

intent to seek interlocutory appeal of the Court's ruling if necessary. *Pl.'s Mot.* at 1. Mr. Doe specifically requests that any trial in this matter be closed in its entirety to the public and media, or alternatively that all testimony of the parties and their family members to be submitted to the jury be taken by telephone or audio-only Zoom along with "appropriate safeguards, including, but not limited to, the partial closure of any trial to the public and media where appropriate, in order to ensure that the identities and other personal identifying information of the Parties and their family members remain anonymous." *Id.* at 2.

## 1.    Trial Closed in its Entirety to the Public and Media

Mr. Doe begins with his legal argument in favor of an entirely closed trial. He contends, first, that "[a]t issue is whether there is a First Amendment and/or common law right of public access to any jury trial in this civil matter." *Id.* He proffers that neither the United States Supreme Court nor the First Circuit has recognized a First Amendment right of access to civil trial proceedings and asserts the First Circuit previously suggested there is no such right. *Id.* (citing *United States v. Kravetz*, 706 F.3d 47, 52 (1st Cir. 2013); *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir. 1992)). If the Court were to consider whether a First Amendment right of access applied, the Plaintiff states that it would follow a two-step inquiry by first considering "experience and logic" and then assessing whether closure of the trial would survive strict scrutiny. *Id.* at 3 (citing *Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 8-9 (1986); *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 20 (1st Cir. 2022)).

**Add. 4**

Turning to the common law right of public access to civil trials, the Plaintiff argues "that access is not unfettered" and requires consideration of "[i]mportant countervailing interests." *Id.* (citing *Kravetz*, 706 F.3d at 59). "Significantly, '[p]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records," he says, adding that in *Kravetz*, the First Circuit instructed courts to consider "the degree to which the subject matter is traditionally considered private rather than public." *Id.* at 3-4 (citing *Kravetz*, 706 F.3d at 59, 62). The First Circuit further noted that "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.* at 4 (citing *Kravetz*, 706 F.3d at 62).

Turning to his case, the Plaintiff asserts that, under the First Amendment or common law standards, the Court should close any jury trial in this case to the public and media. *Id.* at 4.

He begins by raising four First Amendment arguments which he submits support his motion for a closed trial in this matter. First, returning to his "Catch-22" argument, he cites caselaw from the Southern District of New York in which that court, adjudicating a matter involving testimony of trade secrets, "employed the least restrictive means practicable to preserve the confidentiality of legitimate and important trade secrets." *Id.* at 5 (quoting *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 541 F. Supp. 1273, 1278 (S.D.N.Y. 1982) ("To have refused to close the

**Add. 5**

proceedings during the testimony concerning the trade secrets would have . . . put [plaintiff] to the Hobson's choice of not suing [defendant] for use of its name and Index, and indirectly thereby, use of its trade secrets in assuring the accuracy of that Index, or suing and losing forever all the proprietary value of that Index"). Mr. Doe concedes that "Plaintiff's identity is far broader in scope than a litigant's trade secrets, hence the request for closure of the entire trial," but contends "the concern is the same." *Id.*

Second, Mr. Doe argues that requiring him to disclose his identity would deter similarly situated litigants in the future from seeking to enforce NDAs that, by definition, protect their identity and confidential subject matter "and thereby play a negative role (as opposed to a significant positive role) in civil matters of this type." *Id.*

Third, he posits that, although the parties' minor child is not a party to this proceeding, "the child's safety is at the heart of Plaintiff's claims in this case," and asserts "[t]he most reliable way to ensure the minor child's safety and privacy is to close any trial in its entirety to the public and media." *Id.* at 5-6 (citing *Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002) ("When there is a competing interest in secrecy, as in the case of trade secrets, the identity of informers, and the privacy of children, portions and in extreme cases the entirety of a trial record can be sealed . . .[]. The interest in secrecy is weighed against the competing interests case by case")).

Fourth, seeking to differentiate his case from a prior matter in this District, he says "in contrast, the dispute is purely private and does not involve any public

interest as the constitutionality of a state law." *Id.* at 6 (citing *Nat'l Org. for Marriage v. McKee*, Civil No. 09-538-B-H, 2010 U.S. Dist. LEXIS 90749, at *10 (D. Me. Aug. 24, 2010) (citation amended)).

Turning to address the common law right of public access, Mr. Doe disputes "a common law right of access to any civil jury trial in this matter" because, under *Kravetz*, "identification of Plaintiff as the winner of the lottery is the type of private financial information that weighs heavily against disclosure, as are the safety and privacy interests of the Parties' minor child." *Id.* at 6-7 (citing *Kravetz*, 706 F.3d at 62). Thus, he contends that, "when weighing the competing interests between public access and the Parties' and third parties' privacy interests, this is one of those exceptional cases where any trial in this matter should be closed in its entirety to the public and media." *Id.* at 7.

### 2. Use of Pseudonyms for the Parties and their Family Members

In addition to moving for a closed trial, the Plaintiff also asks that "the identities of the Parties, their minor child, and their family members remain unknown to the public and media, including through trial." *Id.* He avers that when evaluating the propriety of using pseudonyms in a civil case, the First Circuit has directed courts to weigh the "totality of the circumstances" and cautioned that pseudonyms should only be used in "exceptional circumstances," such as where (1) a "would-be Doe who reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)"; (2) identifying the would-be Doe would harm innocent non-parties"; or (3) "the injury litigated against would

6

**Add. 7**

be incurred as a result of the disclosure of the party's identity." *Id.* (quoting *Doe v. MIT*, 46 F.4th 61, 70-72 (1st Cir. 2022) (internal quotation marks and punctuation omitted by Plaintiff)). Mr. Doe reminds the Court of its discretion to determine the need for anonymity in a given case. *Id.* at 7-8 (citing *MIT*, 46 F.4th at 72, 74; *Doe v. Town of Lisbon*, 78 F.4th 38, 46 (1st Cir. 2023)). He also incorporates his arguments asserted in his November 15, 2023 motion to proceed under pseudonym. *Id.* at 8 (citing *Mot. for Leave to Proceed under Pseudonym and for Protective Order, and Mem. in Support* (ECF No. 4)).

### 3.   Partial Closure and Zoom Testimony

If the Court does not grant the Plaintiff's motion for a trial sealed in its entirety and the use of pseudonyms for the duration of the proceeding, Mr. Doe alternatively requests that all trial testimony of the parties and their family members be taken by telephone or audio-only Zoom with "appropriate safeguards," including partial closure of any trial to the public and media "where appropriate" to ensure the identities and other personal identifying information of the parties and their family members remain anonymous. *Id.* at 8-9. He reports that, since the onset of the COVID-19 pandemic, testimony by telephone or Zoom "has become common," and, in the instant case, this approach would appropriately balance the competing interests of anonymity and public access. *Id.* at 9.

The Plaintiff concludes by reiterating his request for a closed trial and requesting oral argument on this motion. *Id.* at 10.

### B.     The Defendant's Opposition

Ms. Smith opposes what she terms the Plaintiff's "extraordinary, unprecedented request," averring he "does not cite *any* case entirely closing a trial, or indeed, cite *any* case supporting his 'alternative' request to allow witnesses to testify anonymously by telephone." *Def.'s Opp'n* at 1 (Defendant's emphasis ).  Given the Plaintiff's clear aversion to a public trial, the Defendant maintains he should dismiss his claims against her.  *Id.*  She proceeds to address the issue of pseudonyms and a closed trial raised by the Plaintiff.

### 1.     Use of Pseudonyms at Trial

Ms. Smith first reminds the Court that it said in a previous order that "the caselaw has repeatedly shown[] even when pseudonyms are allowed during the discovery phase in the run-up to trial, there is no guarantee that the Court will sanction their use if the case goes to trial."  *Id.* at 4 (quoting *Order on Mot. to Unseal* at 28-29 (ECF No. 71) (internally citing *Tourangeau v. Nappi Distribs.*, No. 2:20-cv-00012-JAW, 2023 U.S. Dist. LEXIS 29369 (D. Me. Feb. 22, 2023); *MIT*, 46 F.4th at 73) (citation amended)).  The Defendant questions whether it would be consistent with this cited caselaw to allow the parties to continue proceeding by pseudonyms at trial.  *Id.* (citing *Order on Mot. to Unseal* at 28-29; *MIT*, 46 F.4th at 67).

She next argues, "[a]s a practical matter," "it is difficult to see how allowing the parties to use pseudonyms at trial would make any difference if all of the other witnesses are relatives, partners, friends, and business associates, and their testimony concerns what the parties said and did."  *Id.*  Ms. Smith proffers that it is

"inevitable that witnesses will identify the parties at trial," particularly because some of the Plaintiff's proffered witnesses are children. *Id.*

### 2. Courtroom Trial Closure

Turning to the Plaintiff's motion for an entirely closed trial, the Defendant responds that federal civil trials are presumptively open as a matter of federal civil procedure. *Id.* at 4-5 (citing FED. R. CIV. P. 43(a) ("[a]t trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise"); FED. R. CIV. P. 77(b) ("[e]very trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom"); FED. R. CIV. P. 1)).

Ms. Smith argues the Supreme Court has established that the First Amendment guarantees the press and public a right of access to criminal proceedings and has noted in dicta that historically both civil and criminal trials have presumptively been open. *Id.* at 5 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580-81, 580 n.17 (1980) ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open")). The Defendant observes that the Plaintiff's argument to the contrary lacks citations, and reminds the Court of its prior holding that, while the applicability of the First Amendment to civil cases is unsettled in Supreme Court and First Circuit jurisprudence, there is a robust common law right of public access in civil cases. *Id.* at 5-6 (citing *Order on Mot. to Unseal* at 9-14). Ms. Smith proceeds to cite caselaw from other district and circuit

**Add. 10**

courts concluding there is such a First Amendment or common law right of public access to civil trials, some similarly relying on the Supreme Court's dicta in *Richmond Newspapers*. *Id.* at 6-7 (collecting cases). The Plaintiff's cited caselaw from the Southern District of New York and the Seventh Circuit, Ms. Doe submits, is inapposite to the closed trial requested here because these cases involved, respectively, a forty- to fifty-minute courtroom closure during the duration of one witness's testimony regarding trade secrets and the reversal of the sealing of a settlement agreement. *Id.* at 7-8 (citing *Standard & Poor's Corp.*, 541 F. Supp. at 1274; *Jessup*, 277 F.3d at 926).

Ms. Smith argues Mr. Doe "does not even attempt to clear th[e] high bar" required to overcome the presumption of public access to civil trial. *Id.* at 8-9 (citing *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 at 1070-71 (3d Cir. 1984) ("[T]o limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest")). "As Johnny Depp, Rudy Giuliani, Britney Spears, and many others have discovered," she insists, "even rich and famous people are required to try their messy, embarrassing, civil cases in public." *Id.* at 9.

### 3. Plaintiff's Alternative Request for Anonymous Testimony

Next, Ms. Smith argues that Plaintiff's alternative request of anonymous telephone or audio-only Zoom testimony "fares even worse" and that Mr. Doe "does not point to a single case that allowed parties to phone it in at trial." *Id.* at 10 (citing *Pl.'s Mot.* at 8-10). She says that Mr. Doe "concedes it may not work and may have

deleterious collateral effects . . . and it certainly won't work because it doesn't extend to Plaintiff's girlfriend, friends, and business associates, all of whom are potential witnesses. Only a complete closure would satisfy Plaintiff's professed objective, and that is impermissible." *Id.* (citing *Pl.'s Mot.* at 9).

Ms. Smith concludes by urging the Court to deny the Plaintiff's request and order that a trial in this matter proceed open to the public and press. *Id.*

### C. The Intervenor's Opposition

Maine Trust also opposes the Plaintiff's request for a closed trial and the use of audio-only testimony, arguing "American civil trials must be open to the public" and there is no exception for NDAs or wealthy parties, "notwithstanding the extra security problems that the very wealthy sometimes face." *Intervenor's Opp'n* at 1.

#### 1. Closed Trial

First, Maine Trust argues the Federal Rules of Civil Procedure, the common law right of public access, and the First Amendment all preclude sealing the trial in the instant case. *Id.* (citing FED. R. CIV. P. 77(b); FED. R. CIV. P. 43(a); *B.H. v. McDonald*, 49 F.3d 294, 297 (7th Cir. 1995)). The Intervenor discusses caselaw from the Supreme Court establishing that "[t]he First and Fourteenth Amendments clearly give the press and the public a right of access to trial themselves, civil as well as criminal," *id.* at 2 (quoting *Richmond Newspapers*, 448 U.S. at 599 (Stewart, J., concurring)), and "[h]istorically, both civil and criminal trials have been presumptively open." *Id.* (quoting *Richmond Newspapers*, 448 U.S. at 580 n.17). Further, it notes the First Circuit's holding that "each of [its] sister circuits have

**Add. 12**

considered whether the right [of public access] extends to at least some documents and proceedings in civil cases and have concluded that it does." *Id.* (quoting *Courthouse News Service v. Quinlan*, 32 F.4th 15, 20 n.8 (1st Cir. 2022), and collecting cases from other circuit courts and the Supreme Court)). Maine Trust further argues "the common-law right of access extends to judicial records in civil proceedings." *Id.* (quoting *In re Providence J. Co., Inc.*, 293 F.3d 1, 13 n.5 (1st Cir. 2002) (then collecting cases)).

In addition, Maine Trust argues none of the exceptions enumerated in Rule 43(a) or 77(b) applies to the instant matter, and no special circumstances are present to outweigh either the First Amendment or common law right of access to justify sealing. *Id.* at 2-3 (citing *Kravetz*, 706 F.3d at 62 (in some instances, courts may allow sealing of "financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters"); *Publicker*, 733 F.2d at 1071 (under the First Amendment right of access, there must be a showing of "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest") (in turn quoting *Press-Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984)). The Intervenor stresses that the cases cited by Plaintiff do not overcome this presumption and emphasizes that, while the Seventh Circuit acknowledged "the entirety of a trial record can be sealed," that court clarified this would only apply "in extreme cases" and did not contemplate the possibility that an entire trial would be sealed as well. *Id.* at 4-5 (quoting *Jessup*, 277 F.3d at 928).

**Add. 13**

Further, Maine Trust argues the parties' NDA does not overcome the well-established public right of access.  *Id.* at 5 (citing *Schnatter v. 247 Grp.*, No. 3:20-cv-00003-BJB-CHL, 2024 U.S. Dist. LEXIS 111010, at *4 (W.D. Ky. June 24, 2024) (the existence of a confidentiality clause does not "automatically justify sealing documents in litigation") (citation amended); *Martis v. Dish Network*, No. 1:13-cv-1106, 2013 U.S. Dist. LEXIS 160786, at *6 (W.D. Mich. Nov. 12, 2013) ("Once the parties resort to the courts, however, their confidentiality agreement does not, and cannot, authorize the sealing of a presumptively public federal court record.  The parties are privileged to arbitrate in secret, but they must litigate in public") (citation amended)).  The Intervenor thus argues "[h]aving not availed themselves of the option of including a confidential arbitration clause in their [NDA], the parties must litigate in a public forum."  *Id.* (citing *Bloom Energy Corp. v. Badger*, No. 21-cv-02154-PJH, 2021 U.S. Dist. LEXIS 170360, at *33 (N.D. Cal. Sept. 8, 2021)).  "Nor do any cases authorize the sealing of civil cases simply because the parties have a minor child whose identity they seek to conceal, or because the parties seek to conceal their wealth," Maine Trust contends.  *Id.* at 6.

## 2.    Use of Pseudonyms at Trial

Turning to the Plaintiff's motion to proceed through trial under pseudonym, Maine Trust argues the Court should deny this request and proffers "[e]ven courts that have allowed pseudonyms during the early stages of trial have generally been reluctant to extend this to trial."  *Id.* (citing *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) ("[T]he balance between a party's need for

anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses"); *Order on Mot. to Unseal* at 28-29)). Acknowledging that the use of pseudonyms at trial "may be permissible in some trials involving highly intimate personal details," the Intervenor argues those circumstances are not present here. *Id.* at 6-7 (collecting cases from the Eleventh Circuit permitting anonymous testimony by alleged sexual assault victims and "women who were videotaped engaging in sexual conduct when they were minors"). Maine Trust argues that, in addition to the presumption of the public right of access, anonymous testimony could create additional issues such as "frequent unnatural pauses, unintentional mistakes, or confusion," diminished witness credibility, a tendency for pseudonymous witnesses to "fabricat[e] or embellish[] an account," and jury administration challenges in the event a witness inadvertently testified to a witness's real name. *Id.* at 7 (citing *Lawson v. Rubin*, No. 17-6404, 2019 U.S. Dist. LEXIS 181192, at *10 (E.D.N.Y. Oct. 17, 2019) (citation corrected)).

Finally, Maine Trust responds to the Plaintiff's argument that the Intervenor's co-counsel wrote in a recent law review article that "[c]ourts often note that plaintiffs can proceed pseudonymously if the 'injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity.'" *Id.* at 8 (quoting *Pl.'s Mot.* at 7-8 n.3). Maine Trust argues "Plaintiff omits the immediately following paragraph from that article," which states:

> Read broadly, this concern would authorize pseudonymity in nearly all defamation or disclosure of private fact claims . . .. After all, requiring such plaintiffs to identify themselves would only further exacerbate the injury. And a few cases have taken that view. But the dominant view

is contrary, which is why libel and privacy cases . . . are routinely litigated without pseudonyms.

*Id.* (quoting Eugene Volokh, *The Law of Pseudonymous Litig.*, 73 HASTINGS L. J. 1353, 1396 (2022) (footnotes omitted by Intervenor)).  Maine Trust insists "[t]hat article's summary of the cases is thus consistent with this brief."  *Id.*

### 3.  Plaintiff's Proposed Alternatives

Finally, Maine Trust challenges the Plaintiff's proposed alternative as "overly broad and impractical."  *Id.*  "The right to attend a trial and observe witness testimony is invaluable and irreplaceable," it argues.  *Id.* at 8-9 (citing, e.g., *ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.  The ability to see and to hear proceeding as it unfolds is a vital component of the First Amendment right to access"); *Publicker*, 733 F.2d at 1072).  Audio testimony is similarly incapable of capturing such detail, Maine Trust insists.  *Id.* at 9 (citing *Morris Publ'g Grp., LLC v. State*, 136 So. 3d 770, 780 (Fla. Dist. Ct. App. 2014)).

While certain circumstances, particularly involving undercover law enforcement officials testifying against violent criminals, may justify obscuring a witness's appearance, Maine Trust asserts "this case appears to be quite distant from those rare situations."  *Id.* at 9-10 (citing *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir. 1991)).  "To the extent that Plaintiff is concerned about possible risk to himself or his family, that possible risk stems simply from Plaintiff's wealth," and "[u]nder that rationale, the secretly wealthy would be able to testify by audio only in all cases . . . in which their wealth might be disclosed."  *Id.* at 10.  That cannot be the

**Add. 16**

rule of a legal system which aims to treat rich and poor equally, Maine Trust maintains. *Id.*

Maine Trust concludes by urging the Court to dismiss the Plaintiff's motion and echoing his request for the Court to schedule oral argument on this matter. *Id.*

### D. The Plaintiff's Replies

Mr. Doe replied separately to the respective responses in opposition submitted by the Defendant and the Intervenor.

### 1. The Plaintiff's Reply to the Defendant's Opposition

Mr. Doe's replies to Ms. Smith by reasserting his argument that "this is one of those limited cases where the total closure of trial and continued use of pseudonyms is justified." *Pl.'s Reply to Def.* at 1. He reiterates his concern that a public trial could result in irreparable harm to the parties, their minor child, and others, and, further, that allowing the media and public access to a future trial in this matter would effectively defeat the purpose of the parties' NDA. *Id.* at 2.

Turning to his legal arguments for a closed trial, Mr. Doe restates his contention that there is no absolute First Amendment or common law right of public or media access to a civil trial, *id.* (collecting cases), and, adds that no First Amendment or common law right attaches to this specific trial. *Id.* at 2-5. Elaborating on the First Amendment right, he argues a public trial risks their minor child's safety and thus overcomes the presumption of the public right of access; alternatively, he contends that "even if a First Amendment right of access attaches in this case, closure of any trial passes strict scrutiny." *Id.* at 3-4. Addressing the

common law presumption and *Kravetz*, the Plaintiff insists the balance between the presumptive right of public access and "competing interests" weighs in favor of a closed trial in this case because "[t]here is simply no way to grant Plaintiff the relief he seeks—to protect his identity and his and his minor child's safety—if the media and public are granted access to this trial." *Id.* at 4.

Next, Mr. Doe restates his contention that the totality of circumstances warrants the continued use of pseudonyms in this case because "the Plaintiff's identity—and the risk of his and his minor child's safety by public disclosure of his identity—are <u>central</u> to the case." *Id.* at 5 (Plaintiff's emphasis).

Finally, Mr. Doe urges the Court to exercise its discretion to "consider reasonable alternatives to closing the trial," such as permitting anonymous testimony by telephone or audio-only Zoom. *Id.* at 6. He maintains that Federal Rule of Civil Procedure 43(a) grants the Court with discretionary authority to permit a witness's testimony via contemporary transmission. *Id.*

## 2. The Plaintiff's Reply to the Intervenor's Opposition

Mr. Doe replies separately to Maine Trust but raises similar arguments as in his reply to Ms. Smith, essentially contending that this is an exceptional case warranting the use of pseudonyms and "the complete closure of trial." *Pl.'s Reply to Intervenor* at 1. He argues, again, that there is no First Amendment or common law right of public or media access to any trial in this matter, *id.* at 2-5, and, under the totality of the circumstances, the continued use of pseudonyms is warranted. *Id.* at 5-6. Finally, he restates his contention that the Court should use its discretion to

consider reasonable alternatives to closing the trial, including through the use of anonymous witness testimony by telephone or audio-only Zoom. *Id.* at 6.

## III.   LEGAL STANDARDS

### A.      The First Amendment Right of Access

The First Circuit has explained that there are "two related but distinct presumptions of public access to judicial proceedings and records: a common-law right of access to 'judicial documents,' and a First Amendment right of access to certain criminal proceedings and materials submitted therein." *Kravetz*, 706 F.3d at 52 (quoting *In re Providence J.*, 293 F.3d at 9). In its description of the First Amendment right of access, the First Circuit was careful to observe that this right of access relates to "certain <u>criminal</u> proceedings and materials submitted therein." *Id.* (emphasis supplied). In *Courthouse News Service v. Quinlan*, 32 F.4th 15 (1st Cir. 2022), the First Circuit wrote: "[n]either this court nor the Supreme Court has recognized any right under the First Amendment to access documents filed in civil cases." *Id.* at 20.

The *Courthouse News* Court also noted that the "parties agree that there is a qualified First Amendment right in the public to access newly filed complaints." *Id.* Recognizing conflicting law on the issue, the First Circuit cited *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10-11 (1986) as suggesting that there is such a right and *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir. 1992) as suggesting there is not. The First Circuit then resolved the appeal based on the parties' agreement that the First Amendment right of public access applied. In *El Dia*, the First Circuit wrote that it "seriously question[ed] whether *Richmond Newspapers*

[*Inc. v. Virginia*, 448 U.S. 555 (1980)] and its progeny carry positive implications favoring rights of access outside the criminal justice system." 963 F.2d at 495.

Based on the unsettled state of Supreme Court and First Circuit authority and, in contrast to *Courthouse News*, an absence of agreement by the parties as to the applicability of the First Amendment to this civil action, the Court follows the prudential practice of the First Circuit of "forgoing broad constitutional holdings unless such holdings are unavoidable." *Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018) (citing *Hudson Sav. Bank v. Austin*, 497 F.3d 102, 106 (1st Cir. 2007) and *El Dia*, 963 F.2d at 494). When faced with whether to rest on the First Amendment in *Kravetz*, the First Circuit declined[1] to reach the constitutional claim and instead resolved the public access issue using the standards in the common law right of access. 706 F.3d at 53.

### B. The Common Law Right of Public Access

The First Circuit extensively discussed the right of public access in *Kravetz* and reiterated that "[c]ourts have long recognized 'that public monitoring of the judicial system fosters the important values of quality, honest and respect for our legal system.'" 706 F.3d at 52 (quoting *In re Providence J.*, 293 at 9 (in turn quoting *Siedle v. Putnam Invs.*, 147 F.3d 7, 10 (1st Cir. 1998))). To uphold these values, once it is determined that the document is a so-called "judicial record," a presumption that it is public applies. *Id.*

---

[1] In *Kravetz*, the First Circuit concluded there is no First Amendment right of public access to a Federal Rule of Criminal Procedure 17(c) subpoena. 706 F.3d at 52-54.

**Add. 20**

The First Circuit explained that a "judicial record" is a document that is "submitted by parties to aid in the adjudication of" an issue before the court and that is "meant to impact the court's disposition of substantive rights." *Id.*; *accord United States ex rel. Nargol v. Deputy Orthopaedics, Inc.*, 69 F.4th 1, 15 (1st Cir. 2023) (stating judicial records are "those 'materials on which a court relies in determining the litigants' substantive rights'") (quoting *Kravetz*, 706 F.3d at 54). Thus, the First Circuit in *Kravetz* decided that, in the criminal context, there is a right of public access to sentencing memoranda and support letters intended to influence a sentence. *Id.* at 56-59. The *Kravetz* Court further rejected the argument that a judicial record need be disclosed only if it actually influenced a judge's decision. *Id.* at 58-59.

At the same time, the *Kravetz* Court observed that "[t]hough the public's right of access is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Id.* at 59 (quoting *Siedle*, 147 F.3d at 10). In other words, while the presumption is broad, exceptional circumstances may counter it. However, the First Circuit cautioned "'only the most compelling reasons can justify non-disclosure of judicial records' that come within the scope of the common-law right of access." *Id.* (quoting *In re Providence J.*, 293 F.3d at 10 (quoting *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)).

The *Kravetz* Court conclusively resolved one issue: whether there is a right of public access to civil discovery. There is none. *Id.* at 55 ("We note that even with respect to civil discovery . . ., there is no right of public access"); *accord Nargol*, 69

F.4th at 15. The First Circuit quoted the United States Supreme Court in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), as stating, "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice." *Kravetz*, 706 F.3d at 55 (quoting *Seattle Times*, 467 U.S. at 33). The *Kravetz* Court went on to say that "[c]onsistent with this authority, we also have concluded that no right of access attaches to civil discovery motions themselves or materials filed with them." *Id.*

In balancing the competing interests in cases where the presumption of public access applies, the district court should consider whether the "personal privacy interests of third parties" are at stake. *Id.* at 61. "[P]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records." *Id.* at 62 (quoting *Standard Fin. Mgmt. Corp.*, 830 F.2d at 411) (quotation marks omitted). The First Circuit directed district courts to "weigh heavily" the privacy interests of third parties in the court's balancing analysis.

In addition, the First Circuit directed the district courts to "consider the degree to which the subject matter is traditionally considered private rather than public." *Id.* (quoting *United States v. Connolly (In re Boston Herald, Inc.)*, 321 F.3d 174, 190 (1st Cir. 2003)). "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion

21

**Add. 22**

of the public." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995)). Addressing sentencing letters, the First Circuit wrote that "discussion of the ill health of members of the authors' families, incidents of domestic violence, and other domestic relations matters" involves "highly personal" information and "appears to have no direct bearing on the public's assessment of the sentences imposed." *Id.* at 62.

The *Kravetz* Court also discussed the right of public access to medical information. *Id.* at 63. It began with the premise that "[m]edical information is . . . 'universally presumed to be private, not public.'" *Id.* (quoting *In re Boston Herald*, 321 F.3d at 190). Even so, "[a]cknowledging the presumptively private nature of medical information does not end the matter" because "[t]he privacy interest in medical information is 'neither fundamental nor absolute.'" *Id.* (quoting *United States v. Sattar*, 471 F. Supp. 2d 380, 387 (S.D.N.Y. 2006)). In this context, the *Kravetz* Court quoted the Second Circuit in saying that "[c]ourts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure." *Id.* (quoting *Amodeo*, 71 F.3d at 1051).

A special consideration in the case at bar is the fact that the Maine Trust, a member of the press, is seeking access to a civil trial. Referring to access to public criminal trials, the United States Supreme Court has written,

> Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public. While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report

what people in attendance have seen and heard. This '[contributes] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system. . ..

*Richmond Newspapers, Inc.*, 448 U.S. at 573 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J. concurring)). As this Court noted in its May 8, 2024 Order on Motion to Unseal, these observations about the vital role of the press in monitoring the courts extend beyond criminal law to the civil administration of justice. *Order on Mot. to Unseal* at 13-14 (ECF No. 71).

## IV. DISCUSSION[2]

Considering the Plaintiff's motion in light of this precedent and these principles, the Court identifies three questions: first, whether the Plaintiff is entitled to a closed trial and, if so, to what extent; second, whether the parties are entitled to continue using pseudonyms at trial; and, third, whether witnesses may be permitted to testify anonymously over the telephone and/or through Zoom-only audio.

### A. The Closure of Trial

From the Court's perspective, Mr. Doe's request that the trial itself be closed to the public is a nonstarter. It runs hard against historic concepts of what the courts are and what they are not in this country. A publicly filed court case is no longer a private matter. In bringing this case, Mr. Doe turned to a forum established by the United States Constitution, funded by American taxpayers, comprising a branch of the federal government, whose procedures must be open and whose rulings must be

---

[2] The Court has twice addressed the sealing issues in this case. *See Order on Mot. to Unseal*; *Order on Mots. to Seal and Unseal* (ECF No. 171). The Court views this order as consistent with its earlier orders.

**Add. 24**

a matter of public record.  As the First Circuit explained in *Kravetz*, there are some limitations at the edges of some unusual cases, but the presumptive rule is public access.

Both the United States Supreme Court and the First Circuit have explained that this rule is consistent with the country's history.  The Supreme Court has noted in dicta that "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open[,] . . . [and] historically both civil and criminal trials have been presumptively open." *Richmond Newspapers*, 448 U.S. at 580 n.17; *see also Huminski v. Corsones*, 396 F.3d 53, 81 (2d Cir. 2004) ("For many centuries, both civil and criminal trials have traditionally been open to the public") (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 386 n.15 (1979)); *Publicker*, 733 F.2d at 1069 ("[The] public right of access to civil trials . . . is inherent in the nature of our democratic form of government").  While the public right of access is not absolute, "[t]here is a longstanding presumption that judicial records are public and that evidence in proceedings should be presented in open court." *McKee*, 2010 U.S. Dist. LEXIS 90749, at *8-9.

Furthermore, in civil matters, the Federal Rules of Civil Procedure instruct that testimony must be taken open court.  Rule 43(a) provides, in relevant part:

> **(a) In Open Court.**  At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. . . .

FED. R. CIV. P. 43(a).  In addition, Rule 77(b) provides:

> **(b) Place for Trial and Other Proceedings.** Every trial on the
> merits must be conducted in open court . . ..

FED. R. CIV. P. 77(b). An example of an exception is where the contents of a pending

patent application, which are confidential by statute, are at issue in the case, and the

Court determines that the public right of access must bend to the preservation of a

trade secret. *See In re Columbia Univ. Patent Litig.*, 330 F. Supp. 2d 18, 21 n.2 (D.

Mass. 2004); 12 CHARLES A. ALLEN, ARTHUR R. MILLER & RICHARD L. MARCUS, FED.

PRAC. & PROC., § 3082 (2014 ed.) (stating that "[u]nder highly unusual circumstances,

portions of the trial may be closed to protect highly confidential information").

It will come as no surprise that the Court applies this well-established

precedent. By its nature, the entirety of the information to be presented at trial is a

"judicial record," under the *Kravetz* definition, constituting documents and

information "submitted by parties to aid in the adjudication of" an issue before the

court and that is "meant to impact the court's disposition of substantive rights."

*Kravetz*, 706 F.3d at 52; *accord Nargol*, 69 F.4th at 15 (stating judicial records are

"those 'materials on which a court relies in determining the litigants' substantive

rights'") (quoting *Kravetz*, 706 F.3d at 54).

The public presumption is not absolute, and the First Circuit has directed

district courts to "consider the degree to which the subject matter is traditionally

considered private rather than public." *Kravetz*, 706 F.3d at 62 (quoting *United*

*States v. Connolly (In re Boston Herald, Inc.)*, 321 F.3d 174, 190 (1st Cir. 2003)).

"Financial records of a wholly owned business, family affairs, illnesses, embarrassing

conduct with no public ramifications, and similar matters will weigh more heavily

25

**Add. 26**

against access than conduct affecting a substantial portion of the public." *Id.* (quoting *Amodeo*, 71 F.3d at 1051). Addressing sentencing letters, the First Circuit wrote that "discussion of the ill health of members of the authors' families, incidents of domestic violence, and other domestic relations matters" involves "highly personal" information and "appears to have no direct bearing on the public's assessment of the sentences imposed." *Id.* at 62.

The Plaintiff has repeatedly argued that this case involves such information: it focuses on the parties' individual finances, family affairs including those involving their minor daughter, and may include information the parties deem to be embarrassing and that they would prefer to keep private. The Court takes these considerations seriously, but the plain fact is that courts often deal with information that people would prefer to keep out of the public eye, and, if the wishes of litigants for privacy trumped the right of public access, courts would become publicly funded forums for private litigation, unaccountable to the public itself.

Furthermore, the Court is not at all as certain as the Plaintiff that the family matters at the center of this case are traditionally so private that judicial decisions are not public. To the contrary, in Maine, which does not appear to be an outlier, courts routinely describe in published divorce cases the intimate financial circumstances of the divorcing couple, sometimes in detail. *See, e.g., McKenna v. Pray*, 2024 ME 58, ¶¶ 1-8, 320 A.3d 415 (2024); *Collins v. Collins*, 2016 ME 51, ¶¶ 2-7, 136 A.3d 708 (2016); *Chase v. Chase*, CUMSC-CV-16-0433, 2018 Me. Super. LEXIS 183, at *5-7 (Me. Super. Aug. 20, 2018); *see also In re Marriage of Burkle*, 135 Cal.

App. 4th 1045, 1070 (2d Dist. Ct. of App. Cal. 2006) (declaring unconstitutional a state statute that allowed a party to a divorce proceeding to seal any pleading that provided identifying financial information); *Douglas v. Douglas*, 146 N.H. 205, 208, 772 A.2d 316 (2001) (affirming divorce court order making public financial affidavits with certain identifying information redacted). Courts generally redact personal or account identifying information from the public record, but they usually do not seal entire proceedings. *See* FED. R. CIV. P. 5.2.

This principle extends to family disputes involving minors. Where children are involved, even in custody disputes, courts routinely issue publicly available orders. The traditional way to protect minors' rights of privacy is to refer to them by initials, sometimes by the first name and a last initial, occasionally by pseudonym or simply as "child." *See, e.g., In re Christian D.*, 2025 ME 16, ¶¶ 1, 2, 8, 10, 331 A.3d 409 (2025) (referring to a three-year-old child who was the subject of termination of parental rights as "the child"); *Capelety v. Estes*, 2023 ME 50, ¶¶ 1-2, 300 A.3d 817 (2023) ("[Nicholas J.] Capelety and [Kyla R.] Estes have a child who was born in 2015"). There is no suggestion by Mr. Doe or Ms. Smith that the identity of their child should be revealed and the Court has permitted them to proceed in this manner.

The Court takes this analysis further. In considering valid exceptions to public access, *Kravetz* considered not only "the degree to which the subject matter is traditionally considered private rather than public," *Kravetz*, 706 F.3d at 62, but also the extent to which the information is "peripheral." *Id.* at 63. Even if the Court were to credit Mr. Doe's contention that this case involves some matters "traditionally

considered private rather than public," the Court cannot conclude that these matters are merely incidental in this case and "appear to have no direct bearing" on the Court's determination of the matter before it. *See Kravetz*, 706 F.3d at 62. Clearly, the issues Mr. Doe now seeks to keep from the public eye are not those that "simply . . . cater to a morbid craving for that which is sensational and impure." *Id.* at 63 (quoting *Amodeo*, 71 F.3d at 1051). Rather, they are the heart of this dispute.

To the contrary, the complaint raises allegations by the Plaintiff that the Defendant, the mother of the parties' shared child, breached an NDA involving the Plaintiff's personal finances. The Plaintiff's core concern is that this alleged breach has threatened the security of himself, the parties' minor daughter, and their family members. As is apparent from the subsequent filings, the NDA allegations are in the broader context of contested custody litigation in state court. *See Order on Mot. to Amend* at 1 (ECF No. 81) ("[Mr. Doe] now seeks to amend his complaint to, among other things, add allegations that Smith violated the NDA by disclosing protected information to her attorney and in state court custody filings regarding his and Smith's minor child"). The federal litigation devolved so that the parties sought sanctions against each other for alleged violations, claims the Magistrate Judge rejected. *Order on Mots. for Sanctions* (ECF No. 82). Furthermore, Mr. Doe currently has one appeal pending before the Court of Appeals for the First Circuit, *Notice of Appeal* (ECF No. 184), and is contemplating another appeal, if the Court does not grant his pending motion for a closed trial. *Pl.'s Mot.* at 1.

Furthermore, although the legal issues presented in the core allegation of a violation of the NDA in this case involve the parties' family matters, they are also undeniably matters of public interest. In some contexts, NDAs have more recently become controversial. *See* Johanna Shinners, *Article: Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Reg.*, 25 MARQ. BENEFITS & SOC. WELFARE L.R. 229 (2024). In some instances, the First Circuit has declined to enforce NDAs because they are "so broad as to be unenforceable," *see TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 48 (1st Cir. 2020), and in others has enforced NDAs. *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193 (1st Cir. 2023). In general, unlike a non-compete agreement, a non-disclosure agreement is "not disfavored under Maine law." *Philippon v. Louth Callan Renewables, LLC*, No. BCD-CIV-2023-00062, 2024 Me. Bus. & Consumer LEXIS 7, at *19 (Me. Super. Apr. 23, 2024). With rare exceptions, courts have focused on whether the NDAs are protecting a legitimate matter of confidentiality, typically in the context of a trade secret or other business-related confidential information. *See Fougere*, 79 F.4th at 188-93; *CPS Sols., LLC v. Sarle*, No. 2:23-cv-00269-NT, 2024 U.S. Dist. LEXIS 54547, at *10-12 (D. Me. Mar. 27, 2024) (finding that a noncompete clause, including a NDA, was necessary to protect legitimate business interests).

There are few cases outside the business context. However, in one non-business matter, the Maine Law Court imposed discipline upon an attorney who sexually harassed a female and entered into a NDA with her to silence her as a potential witness against him. *Bd. of Overseers of the Bar v. Carey*, 2019 ME 136,

215 A.3d 229 (Aug. 15, 2019).  How Maine law should treat the NDA in the instant

case, a non-business agreement designed to keep a former intimate partner from

revealing wealth in the broader context of a custody dispute, is a legitimate matter of

public concern.

At bottom, although some of these issues may be traditionally private until

they come to court, they are the issues the parties have brought to this Court, and

the Court is thus bound to consider them in making its determination on the merits.

The public has a right to understand how and why the Court rules on this matter and

the Court will not shut the door on the public's right of access.  The Court's

determination is consistent with relevant precedent on the right of public access to

judicial records, public access to family matters, including those involving minor

children, and NDAs.

Further, as the Court observed in its order on the motion to unseal, it is of

additional consideration that Maine Trust, a member of the press, seeks access to this

trial.  Referring to access to public criminal trials, the United States Supreme Court

has written:

> Instead of acquiring information about trials by firsthand observation
> or by word of mouth from those who attended, people now acquire it
> chiefly through the print and electronic media.  In a sense, this validates
> the media claim of functioning as surrogates for the public.  While media
> representatives enjoy the same right of access as the public, they often
> are provided special seating and priority of entry so that they may report
> what people in attendance have seen and heard.  This '[contributes] to
> public understanding of the rule of law and to comprehension of the
> functioning of the entire criminal justice system. . ..

*Richmond Newspapers, Inc.*, 448 U.S. at 573 (quoting *Neb. Press Ass'n*, 427 U.S. at 587 (Brennan, J., concurring)). These observations about the vital role of the press in monitoring the courts extend beyond criminal law to the civil administration of justice.

By the Court's reckoning, one of Mr. Doe's main points is that because he is now wealthy, the consequences of his filing this lawsuit are different for him as opposed to other less financially fortunate individuals. *Mot. for Leave to Proceed Under Pseudonym and for Protective Order* (ECF No. 4) (*Pl.'s Mot. to Proceed Under Pseudonym*) ("There are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and dramatic"). He fears his new-found wealth will make him the target of an inquisitive and occasionally malevolent people. *See id.* ("Plaintiff has had to hire a highly respected security firm and strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy"). However legitimate his concerns, a party's wealth alone is not a legitimate reason to restrict the right of public access. Indeed, as he notes in his motion for leave to proceed under pseudonym, Mr. Doe's new-found wealth allows him to afford levels of security and isolation not generally available to the general public, thus mitigating the impact of the public revelation of his new financial status. *See id.*

Upon entering a judgeship, Congress requires each federal judge to take an oath to "administer justice without respect to persons, and do equal right to the poor

and to the rich." 28 U.S.C. § 453. "Every litigant is entitled to have his case heard by a judge mindful of this oath." *Laird v. Tatum*, 409 U.S. 824, 838 (1972). This Court cannot reconcile its sworn oath with Mr. Doe's demand that his trial be closed to the public because he is rich. Indeed, as the United States Supreme Court has explained, the Fourteen Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887)). The Supreme Court's reference to "legislation" includes this Court's congressionally mandated oath of office. *See* 28 U.S.C. § 453.

For the foregoing reasons, the Court declines to grant the Plaintiff's request for a closed trial, either partially or fully. The Court now turns to the narrower issue of whether it will permit the parties and witnesses to proceed under pseudonym at trial.

## B. The Parties' Use of Pseudonyms at Trial

The Court is fortunate to have the benefit of two cases decided recently by the First Circuit and setting forth a comprehensive examination of the use of pseudonyms in federal court proceedings. *See MIT*, 46 F.4th at 61-77; *Doe v. Mills*, 39 F.4th 20, 22-27 (1st Cir. 2022). In *MIT*, the later case, the First Circuit engaged in a detailed examination of the sources of "[j]udicial hostility to a party's use of a pseudonym" and concluded that it "springs from our Nation's tradition of doing justice out in the open, neither 'in a corner nor in any covert manner.'" *MIT*, 46 F.4th at 68 (quoting

*Richmond Newspapers*, 448 U.S. at 567). This Court accepts, as it is bound to do, the First Circuit's conclusion that there is a "strong presumption against the use of pseudonyms in civil litigation," *id.* at 69, and it applies that strong presumption to this case.

The *MIT* Court also discussed the "standard for determining when a party may litigate under a pseudonym." *Id.* After noting that "several of our sister circuits have devised elaborate multi-factor tests," *id.*, the First Circuit declined to establish in this circuit a "multi-factor test[]" because it would not "establish a clear standard." *Id.* Yet, the First Circuit recognized that "some general guidelines may be helpful to the district courts." *Id.* The First Circuit then stressed the "big picture" in that "[l]itigation by pseudonym should occur only in 'exceptional cases.'" *Id.* at 70 (citation omitted). Ruling that the district court should consider the "totality of the circumstances" in making its determination, *id.*, the *MIT* Court provided "four general categories of exceptional cases in which party anonymity ordinarily will be warranted": (1) where the would-be Doe "reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)"; (2) where identifying the would-be Doe would harm "innocent non-parties"; (3) where anonymity is "necessary to forestall a chilling effect on future litigants who may be similarly situated"; and 4) where the lawsuit is bound up with a prior proceeding "made confidential by law." *Id.* at 71-72.

In his memorandum, Mr. Doe refers to his original motion for leave to proceed under a pseudonym for the record support for his current position. *Pl.'s Mot.* at 8

(discussing *Pl.'s Mot. to Proceed Under Pseudonym*)).  As the Court has analyzed it, only two of the four *MIT* factors appear in this case: Mr. Doe's fears of severe harm from disclosure and his concern of harm to his daughter, an innocent third party.  In that motion, as addressed above, Mr. Doe focused on "the unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and drastic."  *Pl.'s Mot. to Proceed Under Pseudonym* at 3. Mr. Doe lists the following risks: (1) kidnap for ransom, (2) stalking and harassment, (3) unwanted attention to his daughter, (4) increased attention to his other family members, (5) cybersecurity vulnerabilities, (6) impersonation and financial fraud, (7) media attention, (8) extortion, (9) solicitation for financial support, and (10) disruptions and restricted movement in daily life.  *Id.*

The Court does not reject the possibility that any of these harmful consequences of great, sudden wealth could happen if the Plaintiff's name were revealed at trial.  But, for many of the reasons the Court has already discussed, it does not conclude that these risks from disclosure of a sudden fortune fit him within the narrow group of exceptional cases where anonymity is allowed.  Depending on how the lines are drawn, this rationale could be applied to a relatively large and certainly prominent slice of the American population.  It would extend beyond lottery winners to heirs to large fortunes, top tier professional athletes, highly successful entrepreneurs, nationally prominent entertainers, including actors and musicians, celebrities of all ilks, including those newly famous on social media; the list goes on and the risks can include members of their families.  Mr. Doe's feared risks from

34

**Add. 35**

public exposure are equally applicable to individuals who are famous for reasons other than wealth, including politicians and ordinary people thrust into the bright light of publicity because of happenstance.

Even so, the entire tier of rich and famous persons could be subject to the same risks Mr. Doe fears and would for the most part prefer not to have their court cases exposed, litigated, and discussed in public. But, as the Court noted earlier, for many of these individuals, great wealth comes with the financial capacity to afford enhanced security and privacy. Mr. Doe is among them, stating in his motion for leave to proceed under pseudonym that he has hired a "highly respected security firm" and that he "strictly adhere[s] to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy." *Id.* Thus, for Mr. Doe, the risks of disclosure are lessened by the precautions he has taken to mitigate such risks.

It is true that Mr. Doe's case is unusual in that his sudden lottery wealth is known but to a very few people, and he is seeking to maintain his anonymity, not somehow restrict his already well established high public profile. As the Court has mentioned to the parties, Mr. Doe faces a classic Catch-22[3]: a lawsuit to enforce his NDA, which prohibits the disclosure of private information, and an upcoming trial at which the private information could be publicly disclosed. But Mr. Doe's dilemma is one of his own making. Parties to sensitive contracts sometimes agree to a confidential arbitration or a confidential mediation, but here the NDA expressly

---

[3]     JOSEPH HELLER, CATCH-22 (1961).

provides that Mr. Doe will be "entitled to temporary injunctive relief" upon breach by Ms. Smith. *See Compl.*, Attach. 1, *Nondisclosure Agreement* ¶ 5. As only a court can issue temporary injunctive relief, Mr. Doe's NDA contained the seeds of its own ineffectiveness.

As regards his daughter, the Court has already noted that she would be identified only by initials and Mr. Doe has provided no evidence for the Court to conclude that if his name were revealed, her privacy would be in jeopardy. Even if it could happen, this possibility does not justify denying the public the right to access this court proceeding. In short, applying the four *MIT* guidelines, the Court concludes that Mr. Doe has not sustained his burden to demonstrate that he fits within the exceptional case where public access should be denied or significantly restricted.

In short, without diminishing the Plaintiff's proffered security concerns for himself and the parties' minor daughter, the Court cannot conclude that these fears of harm outweigh the public's robust interest in open courts. While the presumption of public access is not absolute, it is paramount and an essential component of our legal system, so "important because it 'allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.'" *Mills*, 39 F.4th at 25.

The Court's prior determination in this case that parties could proceed under pseudonym for the early stages of the litigation does not change this outcome. As Ms. Doe correctly states in her opposition, this Court said in its order on motion to unseal that "the caselaw has repeatedly shown[] even when pseudonyms are allowed during

the discovery phase in the run-up to trial, there is no guarantee that the Court will sanction their use if the case goes to trial." *Def.'s Opp'n* at 4 (quoting *Order on Mot. to Unseal* at 28-29 (in turn citing *Tourangeau*, 2023 U.S. Dist. LEXIS 29369; *MIT*, 46 F.4th at 73)). As foreshadowed, the Court now determines that it cannot make such an allowance at trial. While the parties may, in the run-up to trial, move for minor children to proceed under pseudonym, this is a separate matter not currently before the Court, and the Court now declines to grant the Plaintiff's request for the blanket use of pseudonyms by all parties and all witnesses.

## C. Plaintiff's Proposed Alternative

Consistent with its view of the law, the Court also rejects Mr. Doe's fallback position, which is to allow the testimony of the parties and their family members submitted to the jury by telephone or audio-only Zoom. *Pl.'s Mot.* at 8-10. Mr. Doe proposes that the Court partially close the trial during this testimony to the public and the media to assure the anonymity of the parties and the family members. *Id.* at 9. He stresses that if the Court accepted this alternative, the parties and their family members must remain anonymous. *Id.* Both Ms. Smith and Maine Trust object to this proposal. *Def.'s Opp'n* at 10; *Intervenor's Opp'n* at 8-10.

For all the reasons the Court has already discussed, it does not accept Mr. Doe's alternative proposal. Rule 43 provides:

> For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

**Add. 38**

FED. R. CIV. P. 43(a).   The advisory committee's notes on this alternative are instructive:

> Contemporaneous transmission of testimony from a different location is permitted only on a showing of good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition.

FED. R. CIV. P. 43(a) advisory committee's note to 1992 amendments. The advisory committee notes further "[t]he most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place . . ..  Other possible justifications for remote transmission must be approached cautiously." *Id.*  Rule 43, and the advisory committee's narrowing instructions, are consistent with the United States Supreme Court's observation that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

Assuming the Court has the authority to allow for telephonic testimony in a civil jury trial under Rule 43(a), *see Allen v. Wine*, 297 Fed. Appx. 524, 533 (7th Cir. 2008), the Court would not allow it in this case. The centrality of the credibility of the parties and family members to the resolution of the issues in dispute seems obvious. Mr. Doe not only proposes that his identity still be kept secret, but also that the identity of the other critical witnesses be kept secret as well. In fact, he requests

not only that the witnesses' names and identities be secret, but that a jury be restricted from viewing them all, including their facial expressions, body movements, and all other non-verbal responses and expressions. Moreover, as the Court understands it, under Mr. Doe's proposal, questions would not be allowed if they could reveal the witness's identity. Therefore, questions about the witness's age, education, employment, where they grew up, current residence, marital status, children, life experiences, and other similar matters that jurors typically rely upon in assessing a witness's credibility would be off-limits, and the information would be unavailable to the jury. Thus, a jury would hear the testimony by telephone or audio-only Zoom of disembodied voices from anonymous witnesses, including the parties, whose credibility would be critical to its deliberations. In the Court's view, Mr. Doe's proposal does not comport with any trial that the Court is familiar with or that is legally permitted in this country for the issuance of a fair and informed verdict. In short, the Court does not accept Mr. Doe's alternative proposal.

### D. Oral Argument

Finally, despite the parties' request, the Court declines to hold oral argument on this motion. The resolution of the legal issues in this case seems quite clear to the Court and is unlikely to change, even after the efforts of learned counsel. Furthermore, Mr. Doe has stated his intention to appeal this order, if unfavorable, to the Court of Appeals for the First Circuit, and therefore the scheduling and holding of an oral argument would only delay the day when the First Circuit will issue a definitive ruling on the issues presented by Mr. Doe's motion.

## V.     CONCLUSION

The Court DENIES Plaintiff's Motion for Closure of Trial (ECF No. 179).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2025

**Add. 41**

**EXHIBIT**

**A**

### NONDISCLOSURE AGREEMENT

The Agreement is effective as of the 8th day of February 2023 (hereinafter, the "Effective Date").

This NonDisclosure Agreement ("Agreement") is entered into by and between ███████████████ (hereinafter "Father") and ███████████ (hereinafter "Mother") for the following reasons:

AS the parties agree that disclosure of Father's identity ███████████ ███████████ could cause irreparable harm to both parties, their daughter, close family members, friends, and associates if members of the media or the public in general seek to discover Father's identity and assets; and

AS the parties each desire to enter into an Agreement to promote the safety and security of Father, Mother and ███████████ (hereinafter "Daughter"), and to disclose assets and other information for the benefit of Daughter, for her use and maintenance until she reaches the age of majority; and

AS the parties agree that disclosure of the "Protected Subject Matter" defined herein could pose a risk to the safety of the parties, their Daughter, close family members, friends and associates, and that said disclosure could cause irreparable harm; and

AS the parties seek to protect the value of any assets being given by Father for Daughter's use and benefit as well as to share certain assets for the use and benefit of their Daughter during her minority years.

THEREFORE, for consideration as set forth below and for the terms and obligations set forth in this Agreement, the parties agree as follows:

1.   Definitions

(a)  "Authorized Recipient" means Mother, Daughter, Mother's significant other, parties' attorneys, financial advisers, accountants, advisers or others who necessarily need to know or to be authorized by their principals to discuss the Protected Subject Matter defined herein.  To the extent that Mother feels it is necessary to disclosure the Protected Subject Matter to a person or entity that is not an Authorized Recipient of the disclosing party, Mother must obtain said Father's permission to disclose to an additional Authorized Recipient and obtain written acknowledgement of the terms of this Agreement and that person's consent to be bound by the same as further discussed in Section 7 below.

(b)  "Protected Subject Matter" includes information indicating that Father ███████ ███████████████ the amount or existence of any assets of the Father, the amount of any assets being conveyed to the Daughter by Father, the existence of children, family members, friends, and business associates, identity of the

physical location or assets of the Father, or other information which Mother reasonably knows not to disclose to protect Father's privacy.

(c) "Confidential Information" is included but not limited to documents, emails, texts, instant messages, contracts, correspondence, faxes, tapes, audio or video recordings, CD Roms, USB flash drives, photographs or any other format transmitting or embodying data or information. Confidential Information shall include any information with regard to Protected Subject Matter as defined above.

2.     Covenant

For and in consideration of support to be given to Mother and Daughter by Father in the form of ongoing security resources to ensure her safety and except as permission may be specifically granted with the terms herein, Mother agrees to hold in confidence and not to disclose to any third-party, with the exception of Authorized Recipient, any and all information which she necessarily obtains in the maintenance and support of Daughter and the support that is given to either by Father. Mother further agrees not to disclose any Protected Subject Matter defined in this Agreement under the terms set forth herein.

Mother agrees not to directly or indirectly disclose Protected Subject Matter to any person or entity whatsoever, including but not limited to friends, family members, journalists, media organizations, newspapers, magazines, tabloids, television programs, radio programs, blogs, podcasts, social networks, internet service providers, publishers, and databases. Mother further agrees not to disclose Protected Subject Matter in any manner whether it is truthful, fictionalized, on the record, or "off the record."

3.     Permitted Disclosures

Mother understands that she may disclose Confidential Information to her attorneys as required for their professional services. Furthermore, if compelled to disclose Confidential Information pursuant to legal process, such as a Court subpoena, Mother shall provide Father or his representatives with reasonable advanced notice before making any such disclosure. In no event will that date be less than forty-eight (48) hours prior to disclosure.

4.     Notice of Breach

The parties agree that in the event Mother becomes aware of a disclosure of any Protected Subject Matter, whether an intentional or an inadvertent disclosure, she shall report that fact to Father within 24 hours of first acquiring knowledge of that disclosure. Such report shall be made in writing and shall include, at a minimum, (a) the identity of the person(s) to whom unauthorized disclosure was made; (b) when such unauthorized disclosure occurred; (c) the medium by which the unauthorized disclosure occurred; and (d) efforts undertaken by the disclosing party to retrieve the disclosed Protected Subject Matter and/or minimize its re-publication.

**Add. 43**

5.     <u>Remedies for Breach</u>

      Mother recognizes and acknowledges that the terms and conditions of this Agreement are reasonable and necessary in order to protect legitimate interests of Father and Daughter and are not unduly burdensome to Mother.  Mother further agrees that Breach of this Agreement could cause irreparable harm to all parties herein. If Mother engages in any activities in violation of this Agreement, including but not limited to disclosure of Father's identity ███████ ███████████████████████████████████████ disclosure of Daughter's identity ████████████████████████ or any other disclosure prohibited herein, Mother acknowledges and agrees that her failure to abide by the provisions of this Agreement or to even threaten failure to abide by this Agreement would cause irreparable harm to Father, and that any damages suffered by Father as a result of such a breach by Mother are not now able to be ascertained and would be difficult to determine and quantify at the time of any breach.  Mother therefore agrees that Father shall be entitled to temporary injunctive relief for any breach or threatened breach of this Agreement by Mother, without the requirement or necessity of proving actual damages by Father.  Mother further agrees to waive any requirement for posting a bond for such equitable relief, to the extent that a bond may otherwise be required.  Temporary Injunctive relief may be granted pending final determination on the merits of any controversy regarding this Agreement between the Parties.

      Temporary Injunctive relief shall be available in addition to any other remedies available to Father in law or in equity, including but not limited to an award for any damages that may be found to be due to Father as a consequence of Mother's breach of this Agreement.  In the event that Father has to enforce this Agreement by filing a legal action, should Father be the substantially prevailing party that action, Mother shall be liable for reasonable attorney fees, costs and expenses incurred by Father in those legal proceedings.

6.     <u>Amendments</u>

      This Agreement shall be amended only in writing signed by both parties.

7.     <u>Disclosure</u>

      In order for Mother to be able to disclose any of the Protected Subject Matter set forth in this Agreement to anyone else, including her agents or attorneys, such other person must first individually execute a similar confidential Non-Disclosure Agreement with Father. See Exhibit A attached. Prior to asking for such Agreement with a third party, Father may, at his option, choose whether to permit or disallow such disclosure by choosing whether or not to sign such an Agreement.  This section does not apply where such disclosure is legally required as defined above.

8.     <u>Governing Law and Venue.</u>

      The parties agree without regard to principals of conflicts of laws, that the internal laws of the state of Maine shall govern and control the validity, interpretation, performance and enforcement of this Agreement.  The parties further agree that any action relating to this

**Add. 44**

Agreement shall be instituted and prosecuted only in the Courts of York County, Maine or in the Federal Courts with jurisdiction over York County, Maine. The parties hereby consent to the jurisdiction of such Courts and waive any right or defenses relating to venue and jurisdiction over the person.

9.  Duration

This Agreement shall remain in effect through June 1, 2032, representing the date of majority for the Daughter.

10.  Severability

The validity or unenforceability of any particular provision of this Agreement shall not affect the other provisions herein, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were not contained in this Agreement.

This Agreement contains the entire understanding between the parties as to the matters contained herein and no conditions have been agreed to outside of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and date first written above.

DocuSigned by:

████████████████████

DocuSigned by:

████████████████████

4



## Certificate Of Completion

Envelope Id: 0AB1F70E8A4D46529FE9126000A17BF8      Status: Completed
Subject: Complete with DocuSign: ██████████
Source Envelope:
Document Pages: 4      Signatures: 2      Envelope Originator:
Certificate Pages: 5      Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

## Record Tracking

Status: Original      Holder: ████████████      Location: DocuSign
     2/8/2023 10:08:46 AM

| Signer Events | Signature | Timestamp |
|---|---|---|
| ████████████ | ─ DocuSigned by: ─ ████████████ | Sent: 2/8/2023 10:10:37 AM |
| Security Level: Email, Account Authentication (None) | | Resent: 2/8/2023 10:12:31 AM |
| | Signature Adoption: Drawn on Device | Viewed: 2/8/2023 10:15:41 AM |
| | Using IP Address: ████████ | Signed: 2/8/2023 10:16:04 AM |
| | Signed using mobile | |
| Electronic Record and Signature Disclosure: Accepted: 2/8/2023 10:15:41 AM ID: b3936b8a-7cef-4998-9087-3fff571ba990 | | |
| ████████████ | ─ DocuSigned by: ─ ████████████ | Sent: 2/8/2023 10:10:36 AM |
| Security Level: Email, Account Authentication (None) | | Viewed: 2/8/2023 10:11:03 AM |
| | Signature Adoption: Pre-selected Style | Signed: 2/8/2023 10:11:37 AM |
| | Using IP Address: ████████ | |
| Electronic Record and Signature Disclosure: Accepted: 2/8/2023 10:11:03 AM ID: bd0c594f-0669-4e5a-beb9-7670e7fc36ce | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/8/2023 10:10:37 AM |
| Envelope Updated | Security Checked | 2/8/2023 10:12:30 AM |

**Add. 46**

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 2/8/2023 10:11:03 AM |
| Signing Complete | Security Checked | 2/8/2023 10:11:37 AM |
| Completed | Security Checked | 2/8/2023 10:16:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/28/2020 5:18:09 PM
Parties agreed to: ███████

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, ███████████████ (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact** █████████████████

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ███████████████████

**To advise** ████████████████████ **of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at █████████████████ and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from** ████████████████

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ██████████████ and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with** ████████████████

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ███████████████████ and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify ███████████████████ as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by ███████████████████ during the course of your relationship with ██████████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **SARA SMITH**   **,** | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYM
## AND FOR PROTECTIVE ORDER, AND MEMORANDUM IN SUPPORT

Plaintiff ███████████ respectfully moves this Court, pursuant to Fed. R. Civ. P. 5.2, Fed. R. Civ. P. 10, and Fed. R. Civ. P. 26, for permission to proceed under the pseudonym "John Doe," to name the Defendant ████████ in all publicly-available documents as "Sara Smith," and for a Protective Order, redacting the parties' names and address from all documents filed with the Court. In support of this Motion, Plaintiff submits the attached Declaration of Gregory Brown **(Exhibit A)**, and states as follows:

Although Fed. R. Civ. P. 10(a) requires a complaint to name all of the parties, the First Circuit, including this Court, has applied a multi-factor test articulated by the Third Circuit to permit parties in certain cases to proceed under a pseudonym. *Bryan C. v. Lambrew*, 2021 WL 242422, at *1 (D. Me. Jan. 25, 2021) (leave for minor plaintiffs to proceed by pseudonyms granted where desire to maintain anonymity was motivated by legitimate privacy concerns). The Third

1

**Add. 51**

Circuit's test, set forth in *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011), identifies nine factors for a court to consider. Six of the nine factors weigh in favor of allowing a litigant to proceed pseudonymously:

> (1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives.

*See Does v. Mills*, 2022 WL 1747848, at *2-3 (D. Me. May 31, 2022), *citing Megless*, 654 F.3d at 409.

An analysis of these factors in the instant case weighs in favor of Plaintiff's anonymity.[1] The first factor considers the extent to which Plaintiff's identity has been kept confidential. Here, Plaintiff's identity as the January 2023 winner of the $1.35 Billion Jackpot of the Maine State Lottery has been kept confidential prior to this point through the non-disclosure agreement that is the subject of this litigation. The national media reported that a single lottery winner came forward to claim their prize but noted that the winner chose to remain anonymous. The fact that Plaintiff's identity has been kept confidential from the general public weighs against disclosure. *See Doe v. Regional School Unit No. 21*, 2020 WL 2833248, at *3 (D. Me. May 29, 2020) (plaintiff's motion to proceed under pseudonym granted where his identity as a sexual assault victim was not widely known beyond his social circle or among general public).

The second factor considers the basis upon which disclosure is feared and the validity of that basis. Here, Plaintiff's substantial concern about the effect of disclosure on his and his minor daughter's safety, privacy, and mental health is absolutely valid. *Compare Doe v. Trustees of*

---

[1] The fourth factor addresses disputes that are purely legal in nature and is not relevant here.

2

**Add. 52**

*Dartmouth College*, 2018 WL 2048385, at *7 (D. Mass. May 2, 2018) (plaintiff's motion to proceed under pseudonym granted where public disclosure would subject him to reputational damage and impair his future educational and career prospects). There are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and drastic. *See* Letter, dated October 30, 2023, from Wesley S. Brown, attached as **Exhibit B**. Plaintiff has had to hire a highly respected security firm and strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy. *Id.* Plaintiff's security firm has advised that he and his minor daughter are vulnerable to the following challenges and harms:

- kidnap for ransom
- stalking and harassment
- unwanted attention on Plaintiff's minor daughter at school, by her friends, and by other individuals associated with her
- increased attention on Plaintiff's other family members
- cybersecurity vulnerabilities
- impersonation and financial fraud
- media attention
- extortion
- solicitation of services or for financial support
- disruptions and restricted movement in daily life.

*Id.* Plaintiff and his minor daughter have already suffered emotional distress as a result of Defendant's violation of the non-disclosure agreement at issue and now meet with a therapist weekly to deal with feelings of isolation and anxiety. Allowing Plaintiff to proceed under pseudonym would help them avoid additional mental health distress. See *Doe v. Regional School Unit No. 21*, 2020 WL 2833248, at *3 (plaintiff's motion to proceed under pseudonym granted in light of plaintiff's mental health distress factor).

The third factor considers whether there is a public interest in maintaining Plaintiff's anonymity. Here, requiring Plaintiff to disclose his identity might deter similarly-situated litigants

from seeking to enforce non-disclosure agreements that protect their identity and confidential subject matter. *See Megless*, 654 F.3d at 410 (underlying concern is not to deter future claims from being litigated). Further, there is a strong public interest in protecting the identity of lottery winners; the public's unhealthy obsession with the lottery and lottery winners could place Plaintiff and his minor daughter at a heightened risk of harm if Plaintiff's identity were to be publicized in open litigation. *See* Exhibit A.

The fifth factor considers whether a litigant will choose to sacrifice a claim to preserve his anonymity. Here, Plaintiff may decide to forego this action if he is not allowed to proceed under a pseudonym and thereby forfeit his right to recover injunctive relief and damages from Defendant.

Finally, the sixth factor considers whether Plaintiff's motivation is nefarious. *See Megless*, 654 F.3d at 410. Here, nothing could be farther from the truth. Plaintiff's sole motive is to protect his and his daughter's safety and privacy from the foreseeable challenges and harms set forth above. Plaintiff has no illegal or ulterior motive in wanting to remain anonymous.

There are three factors that courts weigh against a litigant proceeding under pseudonym, none of which apply here:

> (7) the universal level of public interest in access to the identities of litigants; (8) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (9) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated.[2]

*See Does v. Mills*, 2022 WL 1747848, at *2-3 *citing Megless*, 654 F.3d at 409. The seventh and eighth factors, in particular, consider the level and strength of the public's interest in knowing the Plaintiff's identity. Here, Plaintiff is not a public figure, and the universal interest in favor of open judicial proceedings "will not be impeded merely because plaintiff's identity is kept private." *See*

---

[2] The ninth factor considers the motivation of any opposition to the use of a pseudonym, which is yet unknown.

**Add. 54**

*Doe v. Trustees of Dartmouth College*, 2018 WL 2048385, at *7 (plaintiff's motion to proceed under pseudonym granted  where his identity was of minimal value to the public).  Moreover, Defendant knows the identity of Plaintiff and will be able to conduct this litigation without impediment regardless of whether Plaintiff's identity is disclosed publicly.

In sum, considering the relevant factors, the circumstances in this case dictate permitting Plaintiff to proceed under the pseudonym "John Doe" and to publicly describe the Defendant using the pseudonym Sara Smith.  The above-described considerations – in particular, the legitimate danger of harm to the safety, security, and mental health of Plaintiff and his minor daughter, outweigh any public interest favoring identification and open litigation.

For the reasons set forth above, Plaintiff respectfully requests that this Court grant his Motion to Proceed Under Pseudonym and for Protective Order.

Respectfully submitted this 15th day of November, 2023

By: */s/* Gregory Brown
Gregory Brown (ME Bar No. 9023)
Louise M. Aponte (ME Bar No. 9285)
LOWE YEAGER & BROWN PLLC
920 Volunteer Landing, Suite 200
Knoxville, Tennessee 37915
Phone: (865) 521-6527
Fax: (865) 637-0540
gb@lyblaw.net
lma@lyblaw.net

**Add. 55**

### CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2023, a copy of the foregoing Motion to Proceed Under Pseudonym and for Protective Order was filed electronically.  Paties may access this filing through the Court's electronic filing system.

/s/ Gregory Brown_____

**Add. 56**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

JOHN DOE,                )
                               )
         Plaintiff,        )
                               )
v.                          )         Civil Action No. _____
                               )
SARA SMITH     ,      )         **FILED UNDER SEAL**
                               )
                               )
         Defendant.      )

**DECLARATION OF GREGORY BROWN**

I, Gregory Brown, being duly sworn, do depose and state as follows:

1. I am attorney for the Plaintiff in this matter.

2. The Plaintiff's true name is ▮▮▮▮▮▮▮▮▮▮▮, of ▮▮▮▮▮▮▮▮. In January 2023, ▮▮▮▮▮▮ won the Maine State Lottery with a jackpot of $1.35 Billion.

3. The Defendant's true name is ▮▮▮▮▮▮▮, of Dracut, Massachusetts.

4. One of the many impacts of such a life-changing event is the immediate effect on the safety and security of ▮▮▮▮▮▮ and his family. According to security consultants, and as summarized in Exhibit A to the Motion to Proceed Under Pseudonym, risks to ▮▮▮▮▮▮ and his family – and particularly his 9 year old daughter – include the following:

     a. Kidnap for ransom
     b. Stalking and harassment
     c. Unwanted attention on ▮▮▮▮▮▮ daughter:
         i. at the school she attends;
         ii. by her friends; and

1

**Add. 57**

        iii.  other individuals associated with her (e.g., parents of kids at the school, in a dance class or extracurricular activity).
- d. Increased attention on ████████ other family members
- e. Cybersecurity vulnerabilities
- f. Impersonation and financial fraud
- g. Media attention
- h. Extortion
- i. Solicitations of services or for financial support
- j. Disruptions and restricted movement in daily life

5. These risks are mitigated, first and foremost, by secrecy and anonymity surrounding ██ ████ sudden wealth.

6. The purpose of this civil action is to enforce a Non-Disclosure Agreement and preserve ████ anonymity and resulting security of his daughter, other family, and himself.

7. Requiring ████ to reveal his identity and/or the identity of ████ would frustrate the purpose of the Non-Disclosure Agreement that is sought to be enforced and provide him with no effective remedy for its breach.

Signed under the pains and penalties of perjury this 15th day of November, 2023.

                  By: */s/* Gregory Brown
                  Gregory Brown (ME Bar No. 9023)
                  Louise M. Aponte (ME Bar No. 9285)
                  LOWE YEAGER & BROWN PLLC
                  920 Volunteer Landing, Suite 200
                  Knoxville, Tennessee 37915
                  Phone: (865) 521-6527
                  Fax: (865) 637-0540
                  gb@lyblaw.net
                  lma@lyblaw.net

**Add. 58**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 15th day of November, 2023, a copy of the foregoing Motion to Proceed Under Pseudonym and for Protective Order was filed electronically. Parties may access this filing through the Court's electronic filing system.

/s/ Gregory Brown

3

**Add. 59**

October 30, 2023

To Whom It May Concern:

In January of 2023, █████████████████ engaged my firm, ██████████████████, to advise him on managing an unprecedented and unexpected financial windfall he experienced through a lottery. ████████ requested that we help him identify and manage risks inherent to being an ultra-high-net-worth individual, as this was something for which he wisely acknowledged having little to no understanding. ████████ also aimed to protect his family from experiencing the consequences of extreme wealth, so they could more fully experience its many benefits.

██████████ intentions felt clear and reasonable to me. I felt our team was well-positioned to offer advice on several topics related to financial risks. However, when it came to dangers regarding privacy and safety, I thought it would be wise to bring in an outside resource. With that in mind, I researched and contacted my network for a premier and highly respected security advisor who could fill the gaps.

Unsurprisingly, a firm dedicated to protecting the safety and privacy of at-risk and prominent families is also keen to protect the same for themselves. As such, I am preparing this document to memorialize the advice and wisdom the security firm offered us.

In our conversations with this security firm, they advised being familiar with the security programs of many prominent people, including some like ████████, who experienced swift and drastic increases in wealth. We discussed how ████████ circumstance is unique. It differs from most situations where an individual accumulates wealth over many years—often decades—versus days like in ████████ case. We discussed how such situations naturally present more uncertainty and risk, as the individual has little time to prepare and gradually dial up appropriate precautions.

We discussed how, given the amount of attention paid to lottery wins in amounts like ████████, it is likely that individuals will communicate and act in inappropriate ways—some that stand to challenge the safety and privacy of ████████ and his family. The security firm advised that although significant uncertainty and risk are associated with such fast and drastic increases in wealth, in their experience, it is all quite manageable.

Of relevance, they stressed the importance of focusing on what we can control and accepting what we can't. This wisdom was partly intended to enhance peace-of-mind. However, it was strategically aimed at immediate family members who possess the most insight about ████████ wealth, whereabouts, relationships, upcoming plans, family members, etc. In other words, these trusted individuals have the most knowledge about vulnerabilities.

The security firm described a concept for safety programs as "concentric rings." A layered approach to protection. Technologies like fences, gates, alarm systems, and dogs are all examples of rings of protection—some farther out from what we're protecting, and some closer to it. Privacy is the outermost ring. For if people with sinister intent don't know when and where to encounter us, they can't plan the how. Even better, if those people posing a risk don't know who we are (our wealth and vulnerabilities), they will never consider the actions we're seeking to avert.

Another way the security firm described it: Privacy and Confidentiality are the most proactive security measures. Some wealthy individuals and families are so publicly prominent—due to their

careers, philanthropy, and so on—that maintaining privacy is impractical.  Such cases require a greater focus and investment into other precautions (e.g., armored vehicles, private jets, bodyguards, ongoing threat assessments).  For ██████████ circumstance, the security firm noted he and his family have a rare opportunity to experience the benefits of wealth while at the same time maintaining a "low-profile."  However, the security firm emphasized that accomplishing this requires a strict adherence to privacy and confidentiality practices by █████████ his family, and those closest to them.

To illustrate the gravity of these concepts, the security firm listed several vulnerabilities that will naturally increase should the number people with knowledge of his wealth increase.  Examples they cited include:

- ☐ Kidnap for ransom
- ☐ Stalking and harassment
- ☐ Unwanted attention on ████████ daughter:
  - ○ at the school she attends;
  - ○ by her friends; and
  - ○ other individuals associated with her (e.g., parents of kids at the school, in a dance class or extracurricular activity).
- ☐ Increased attention on ████████ other family members
- ☐ Cybersecurity vulnerabilities
- ☐ Impersonation and financial fraud
- ☐ Media attention
- ☐ Extortion
- ☐ Solicitations of services or for financial support
- ☐ Disruptions and restricted movement in daily life

To date, █████████ and his family have not experienced many predictable challenges that can be intrinsic to their new circumstances. It's impossible to know what risks these reasonable precautions might have prevented. We believe the lack of challenges experienced is a direct byproduct of following the security advisor's guidance.

█████████ intends to continue taking practical precautions to prevent foreseeable risks to him and his family. He will continue to consult with the security firm to ensure such safeguards are implemented in a balanced way and not in reaction to misinformed understandings of risks.

Sincerely,

████████████

Principal