# United States Court of Appeals
## For the First Circuit

No. 25-1373

JOHN DOE,

Plaintiff, Appellant,

v.

SARA SMITH,

Defendant, Appellee, and

MAINE TRUST FOR LOCAL NEWS L3C, d/b/a Portland Press Herald,
d/b/a Maine Sunday Telegram,

Intervenor, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Louise M. Aponte, with whom Gregory Brown, Lowe Yeager & Brown PLLC, Stephen B. Segal, and Verill Dana LLP were on brief, for appellant.

Peter J. Brann, with whom Hannah L. Wurgaft and Brann & Isaacson were on brief, for appellee Smith.

Eugene Volokh, with whom Sigmund D. Schutz, Alexandra Harriman, and Preti, Flaherty, Beliveau & Pachios, LLP were on brief, for appellee Maine Trust for Local News.

September 15, 2026

**ROE, Circuit Judge.**[1]

Hitting the jackpot isn't always everything it's cracked up to be. Just ask "John Doe," today's appellant.

Doe won 1.35 *billion* (yes, *billion* with a "b") dollars in the Maine State Lottery. And then he made "Sara Smith," the mother of his child, sign a non-disclosure agreement ("NDA") swearing her to secrecy about the win and his identity. But Smith may have spilled about Doe's lotto win anyway, thus violating the

[1] Just kidding -- Judge Thompson authoring here.

But wouldn't it raise eyebrows if the parties and the public didn't know who was deciding the case? Thankfully, even if the panel opted to publish a per curium opinion so that the identity of the authorizing judge was not disclosed, we've still got all our names on the cover page to let the public know the judicial arbiters.

As you'll see throughout today's opinion, we believe our precedent makes paramount the principle of transparency as a bulwark of the effectiveness of our judicial system and the public's trust in it. As Chief Justice of the United States Warren Burger once said, "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." See Adam Liptak, Secrecy in Lawsuits Has 'Run Amok,' Scholars Say, N.Y. Times, Aug. 27, 2026. (cleaned up). And increased secrecy in the courts has not gone unnoticed. In the view of one recent New York Times article, "[s]ecrecy in lawsuits has 'run amok'" in federal courts, and studies show that "judges are not doing enough to protect the public interest in openness." See id. If true, some would view this as troubling. So putting spotlight on the problem via a creative little formatting tweak in our opening line is an easy thing we can do to remind the public of the historical scaffolding that undergirds our judicial framework of transparency and public access.

All that's to say: that eye-grabbing opener isn't just for show but rather, a preview of what we think today's case highlights, and more importantly, legally demands.

NDA, so Doe brought Smith to federal court (whose jurisdiction arose via the diversity of the parties) seeking an injunction and damages.

For a while, the district court let the parties litigate under pseudonyms. (That's why we're calling these two "John Doe" and "Sara Smith" -- those, of course, aren't their real names.[2]) Yet, as trial neared, Doe moved to shutter the courtroom from the public during the trial and, alternatively, to proceed under pseudonyms throughout trial. Doe sought such drastic measures, he said, mainly to preserve his daughter's privacy and protect her, given the increased risks that came alongside his sudden wealth.

But federal judges take an oath to "do equal right to the poor and to the rich" (codified in 28 U.S.C. § 453). Faithful to that oath, the district court denied Doe's requests in a

[2] Why do we use "John Doe" as a placeholder name in litigation? Its use apparently dates back to the Magna Carta (circa *1215*). See William Safire, Who's John Doe?, N.Y. Times, June 4, 1995. In one account: back then, "two witnesses were needed for legal action; to protect their identities, substitute names were often placed on documents," and the classic example was a landlord-tenant eviction action. Id.

And although John's always been a common name, one might still ask: "Why 'Doe'?" And, while we're at it, "why 'Roe', too?" Well, "[a] doe is a female deer; roe, a less-familiar term for deer, is also a name for fish eggs." Id. And, at least in one lexicographer's account, "'Doe' and 'Roe' were what landowners called men who poached deer and fish, and who would be just the kind of men willing to witness legal documents against the landowners and their landed rights." Id. So now you know about "Doe" (and "Roe").

comprehensive forty-page opinion. See Doe v. Smith, No. 2:23-cv-00423-JAW, 2025 WL 1080750 (D. Me. Apr. 10, 2025).[3]

Now before us, Doe assigns error aplenty to that decision. We can well appreciate some of Doe's concerns -- certainly, we respect his worries about his family's safety lest his identity be unveiled. Yet we discern no abuse of discretion in the district court's careful judgment preserving the common-law tradition of public access to -- and oversight of -- our judicial proceedings. We thus **affirm**.

**HOW WE GOT HERE**

We begin with how the case has unfolded so far.

**A. The Win and the NDA**

Like we said above, Doe hit it big by winning $1.35 billion in the Maine State Lottery in January 2023. Although Maine law does not keep lottery winners' identities' confidential, Doe seemed to claim his jackpot through a legal entity to preserve his privacy.[4] And he soon hired what he described as a "highly respected security firm" that advised him to "strictly adhere to

[3] As intimated above, many cases about pseudonyms have at least one party named "Doe." But for reference, anytime we do a short-cite to a Doe case, it is the district court's order in this decision; for any other "Doe"-dubbed party cases, we use the other party's name to avoid confusion.

[4] See 8 M.R.S.A. § 416-A(9) (providing for the release of information about the winners of Maine's lottery, including names).

a safety program that requires property security, surveillance, and ongoing threat assessments" to protect his family. But those were only the beginning of Doe's endeavors to remain anonymous.

The next month, Doe entered into the NDA with Smith (again, the mother of his minor daughter), so he could maintain his and his daughter's privacy. The NDA precluded Smith from disclosing "Protected Subject Matter" -- namely, details of Doe's lottery win and his finances -- to all but a short list of "Authorized Recipient[s]" without Doe's permission.

And, as the vast font of human experience has shown time and time again, this newfound wealth posed new challenges to Doe. Cf. The Notorious B.I.G., Mo Money Mo Problems, on Life After Death (CD, Bad Boy & Arista Mar. 25, 1997); Herman Melville, Moby-Dick or, The Whale at 6 (Penguin Books 1988) (1851) ("The urbane activity with which a man receives money is really marvelous, considering that we so earnestly believe money to be the root of all earthly ills, and that on no account can a monied man enter heaven. Ah! How cheerfully we consign ourselves to perdition!"). Within a month of the NDA's taking effect, Doe and Smith had become embroiled in a custody dispute.[5]

[5] Though it isn't especially relevant to the appeal, we'll just note briefly what happened, at least in Doe's retelling. Apparently, Smith falsely alleged that Doe kidnapped their daughter during a long trip in March 2023, and Smith's accusation was meant to serve as the basis for her securing sole custody over their daughter.

Around September 2023, Doe apparently discovered that Smith had violated the NDA by wrongfully disclosing details of the Protected Subject Matter to Doe's father and stepmother. And, as a result of that disclosure, Doe claims that "other third parties," including his sister, were now also in possession of the relevant information, even though they shouldn't have been in-the-know. (For her part, Smith denies these allegations, pointing to Doe's sworn declarations where he admits to telling his father about the lotto win.)

**B. The Case**

So, in November 2023, Doe sued Smith in the District of Maine alleging the above-described violations of the NDA and seeking injunctive relief and damages. The next day, Doe moved for leave for both parties to proceed under pseudonyms. And the magistrate judge granted the motion without issuing an opinion.

Naturally, the local press soon took an interest in Doe's suit. In February 2024, the Maine Trust for Local News, L3C d/b/a Portland Press Herald/Maine Sunday Telegram (whom we'll just call "the Maine Trust") moved for leave to intervene. Doe opposed; Smith acceded.[6] Importantly, though the Maine Trust also wanted to unseal several documents, it did not oppose the parties' pseudonymity, though it reserved the right to do so. And the

[6] Still, Smith sought to retain pseudonymity and redaction of personally identifiable information.

district court granted the Maine Trust's motion to intervene, but expressly did not reach the questions of continued use of pseudonyms at that point.

### C. The Order on Appeal

As trial loomed, Doe moved to close trial to the public and, alternatively, to use pseudonyms throughout said trial.[7] To start, he underscored the district court's comments (made during a status conference) that he was essentially faced with a "Catch-22" situation.[8] As the district court put it:

> [E]ven if Plaintiff were to win on his claims, his identity and confidential information would be revealed to the public and the media;

---

[7] As an alternative to the alternative, Doe sought to have some trial testimony take place over the phone or on Zoom -- a request that the district court denied and that Doe does not pursue on appeal.

[8] Drawn from the title of Joseph Heller's 1961 novel, a "catch-22" is a "problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule." Catch-22, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/catch-22. For those interested in the term's origins, the folks at Merriam-Webster explain:

> The catch-22 in Catch-22 involves a mysterious Army Air Forces regulation which asserts that a man is considered mentally unsound if he willingly continues to fly dangerous combat missions but that if he makes the necessary formal request to be relieved of such missions, the very act of making the request proves that he is sane and therefore ineligible to be relieved. Catch-22 soon entered the language as a label for any irrational, circular, and impossible situation.

Id.

> he would effectively lose the privacy war and subject himself and his minor daughter to the irreparable harm he brought suit to avoid.

On the closed trial question, Doe argued that neither the First Amendment nor the common law established the public's unfettered right to access civil trials. In support, he explained how "this whole case is about preserving [his] confidential information," and an open trial would defeat the purpose of the litigation; he argued that an open trial "would deter similarly situated litigants in the future from seeking to enforce non-disclosure agreements"; and he emphasized that his child's safety, which supposedly depended on his confidentiality, is "at the heart of [his] claims in this case." And on the pseudonym question, Doe explained that he faced an "unusually severe harm . . . were his and his minor child's identities to be revealed." Indeed, if he succeeded at an un-pseudonymized trial, he would have "won the battle but effectively lost the privacy war."

Smith and the Maine Trust opposed both closure and pseudonymity on various grounds. (We move past the contents of these filings for now, because they largely track the district court's analysis.)

In a detailed written opinion, the district court denied both of Doe's requests. See Doe, 2025 WL 1080750, at *14 (closure of trial); id. at *15 (pseudonyms). Here are the highlights of its reasoning (with specifics coming later, as needed).

Starting with closure, the district court explained that it was "a nonstarter," because the "presumptive rule is public access." Id. at *10. And while there were some examples in which a limited closure might be appropriate -- for instance, "where the contents of a pending patent application, which are confidential by statute, are at issue" -- this was not one such case. Id. at *11. After all, "courts often deal with information that people would prefer to keep out of the public eye," such as familial and financial secrets (both implicated in this case), but "if the wishes of litigants for privacy trumped the right of public access, courts would become publicly funded forums for private litigation, unaccountable to the public itself." Id.

Moving to pseudonymity, the district court held that the parties could not continue to use pseudonyms should the case go to trial. Id. at *14. It applied our decision in Doe v. MIT, 46 F.4th 61, 69 (1st Cir. 2022), which itself reiterated that there is a "strong presumption against the use of pseudonyms in civil litigation." (We will detail the specifics of Doe v. MIT -- which, to be clear, involved a different "Doe" than today -- later.) And Doe's rationale for pseudonymity -- what the district court described as the "harmful consequences of great, sudden wealth" -- didn't offer much of a limiting principle. Doe, 2025 WL 1080750, at *15. Instead, such a rule "could be applied to a relatively large and certainly prominent slice of the American

population" far beyond "lottery winners to heirs to large fortunes, top tier professional athletes, highly successful entrepreneurs, nationally prominent entertainers," and many others. Id. But importantly for the district court, "great wealth comes with the financial capacity to afford enhanced security and privacy," lessening the "risks of disclosure." Id.

And, as for the catch-22 -- Doe filing "a lawsuit to enforce his NDA, which prohibits the disclosure of private information" but now facing "an upcoming trial at which the private information could be publicly disclosed" -- the district court explained it was a "dilemma . . . of [Doe's] own making." Id. "Parties to sensitive contracts sometimes agree to a confidential arbitration or a confidential mediation," the district court explained, "but here the NDA expressly provides that Mr. Doe will be 'entitled to temporary injunctive relief' upon breach by Ms. Smith." Id. And because "only a court can issue temporary injunctive relief, Mr. Doe's NDA contained the seeds of its own ineffectiveness." Id.

Finally, on Doe's concerns about his daughter, the district court said that in accordance with the court's normal protocol for protecting children, "she would be identified only by initials" during the trial. Id. And, importantly, Doe "provided no evidence for the Court to conclude that if his name were revealed, her privacy would be in jeopardy." Id.

Unsatisfied, Doe timely appealed.

**OUR TWO CENTS**

Now before us, Doe says the district court erred in (1) denying his motion for closure of trial and (2) denying his request to hold a trial using pseudonyms.[9]

Everyone agrees that we review each issue under the "abuse of discretion" standard. See United States v. Kravetz, 706 F.3d 47, 61 (1st Cir. 2013) (public access to judicial records);[10]

---

[9] We have appellate jurisdiction to consider both issues via the collateral order doctrine. That doctrine permits "immediate appellate review of a small class of orders which finally determine claims of right separable from, and collateral to, rights asserted in the action." Doe v. MIT, 46 F.4th 61, 65 (1st Cir. 2022) (cleaned up). It applies "when three conditions are satisfied: the order must conclusively determine the disputed question; it must resolve an important issue completely separate from the merits of the action; and it must be effectively unreviewable on appeal from a final judgment." Id. (cleaned up).

As for the denial of pseudonym use during trial, we've said specifically that such an order fits the bill. See id. at 66. We needn't linger there.

As for the denial of the motion to close trial, we think (and no one contests) it similarly qualifies. The district court's order "conclusively determine[d]" that the trial wouldn't be closed; that order was both "important" and "completely separate from the merits"; and, of course, not reviewing this decision and thus letting the trial proceed as open would indeed make the question "effectively unreviewable on appeal from a final judgment," because it would unmask Doe and Smith's identities. Id. at 65-66 (cleaned up).

[10] Kravetz concerned a journalist's motion to unseal certain documents in a criminal proceeding, not a plaintiff's motion for a closed trial. See 706 F.3d at 51. But the district court thought the case applicable for this reason:

> By its nature, the entirety of the information to be presented at trial is a "judicial

MIT, 46 F.4th at 66 (pseudonyms). Such an abuse "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." MIT, 46 F.4th at 66 (cleaned up). And a trial court never has the discretion "to make a determination that is premised on an incorrect legal standard." Id. (cleaned up).

**A. Trial Closure**

Doe assigns four main errors to the trial court's denial of his motion for a closed trial. Before we get to those errors, though, we provide some principles that guide our analysis.

**Primer**

For starters, "historically both civil and criminal trials have been presumptively open." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 n.17 (1980) (plurality opinion); see also Gannett Co. v. DePasquale, 443 U.S. 368, 386 n.15 (1979)

---

> record," under the Kravetz definition, constituting documents and information "submitted by parties to aid in the adjudication of" an issue before the court and that is "meant to impact the court's disposition of substantive rights."

Doe v. Smith, No. 2:23-cv-00423-JAW, 2025 WL 1080750, at *11 (D. Me. Apr. 10, 2025) (quoting Kravetz, 706 F.3d at 52). Given the parties' agreement about Kravetz's applicability, we see no reason to disturb the district court's application of this framework to these circumstances. And, along with the framework, we import our abuse of discretion standard of review. See Kravetz, 706 F.3d at 61.

("For many centuries, both civil and criminal trials have traditionally been open to the public."); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1066 (3d Cir. 1984) (explaining that "an examination of the authority on which the Supreme Court relied in these cases reveals that the public's right of access to civil trials and records is as well established as that of criminal proceedings and records"); Binh Hoa Le v. Exeter Fin. Corp., 990 F.3d 410, 418 (5th Cir. 2021) (tracing the public's right of access back to "Roman law, where trials were *res publica* -- public affairs").

The Federal Rules of Civil Procedure reflect that common-law history of transparency. Consider Rule 77(b): "Every trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom." (Emphasis added.) Or consider Rule 43(a): "At trial, the witnesses' testimony must be taken in open court," unless another authority requires otherwise. (Emphasis added.) And while courts applying those rules have sometimes recognized that such openness requirements might "be overcome in proper circumstances," everyone agrees that an open trial is the baseline. See, e.g., Standard & Poor's Corp. v. Commodity Exch., Inc., 541 F. Supp. 1273, 1276 (S.D.N.Y. 1982) (describing a "presumption" of open trials).

Doe's attempt to carve out an exception to the common-law right of access relies primarily on Kravetz, 706 F.3d at 47, a

case about a reporter's attempt to access sealed documents in a criminal proceeding.[11] Like the district court, we think Kravetz, though not a perfect fit on the facts, offers us a helpful framework for weighing the competing interests in adjudicating a motion to close a trial to the public where, as here, the parties agree that its framework applies. See Doe, 2025 WL 1080750, at *12 (discussing Kravetz). So we'll spell out what, precisely, we said there.

Kravetz explained that while "the public's right of access is vibrant, it is not unfettered," and "important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." 706 F.3d at 59 (cleaned up). Some of those countervailing interests, we said, are "privacy rights of [participants] and other third parties." Id. at 62. (cleaned up). In determining whether the protection of those rights defeated the presumptive right of access, we instructed courts to consider "the degree to which the subject matter is traditionally considered private rather than public," as well as "the nature and degree of injury" to be sustained if the information was unveiled. Id. (cleaned up). Likewise, "financial

[11] We stop here to note that Smith also argued (both here and below) that the First Amendment right of access supported denying Doe's motion to close trial. See Doe, 2025 WL 1080750, at *4. The district court declined to reach that argument, citing constitutional avoidance principles. See id. at *8. We do the same.

records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." Id. at 62 (cleaned up). And finally, in quoting from one of our past decisions, we explained that the trial court "enjoys considerable leeway" in making the decision to restrict access (or not). Id. at 61 (quoting Siedle v. Putnam Invs., Inc., 147 F.3d 7, 10 (1st Cir. 1998)).

**Discussion**

That explained, we turn now to Doe's various arguments. (Spoiler: none persuade us.[12])

**First,**[13] Doe opens his attack on the district court's decision by saying that it failed to consider Doe's constitutional "contractual privacy rights" in its analysis. But we can make quick work of this one. In his opening brief, Doe cites only one case to support his proposition that such a constitutional contract right exists, Adkins v. Child. Hosp. of the D.C., 261 U.S. 525, 545 (1923). But there is a big problem for Doe: the Supreme Court

[12] Giving credit where it's due, our reasoning largely tracks that of Smith and the Maine Trust.

[13] Just a heads up, we use these bolded ordinal words to set apart Doe's big (i.e., worth their own heading in his brief) arguments.

overruled that Lochner-era case almost ninety years ago.[14] See W. Coast Hotel Co. v. Parrish, 300 U.S. 379, 400 (1937) ("Our conclusion is that the case of Adkins v. Children's Hospital . . . should be, and it is, overruled."). And although Doe rightfully acknowledges that error in his reply brief, he doesn't provide any other caselaw that explains why his NDA should constitutionally compel the district court to shutter the courtroom doors. So that settles that.[15]

Along similar lines, Doe says the district court overlooked "relevant case law that . . . recognizes the propriety of excluding the media and public from a civil trial to protect competing contractual and privacy interests." But none of Doe's cases come close to supporting what he wants: full-scale closure

[14] The Lochner Era, deriving its name from Lochner v. New York, 198 U.S. 45 (1905), evades easy definition. See Epic Sys. Corp. v. Lewis, 584 U.S. 497, 521 (2018) ("'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding." (quoting Laurence H. Tribe, American Constitutional Law 435 (1978)). But most commonly, it refers to the Supreme Court's early-twentieth-century decisions invalidating legislative efforts to protect workers' rights and promote labor reform; as Justice Ginsburg explained, the Lochner court "invalidated [such] legislation based on then-ascendant notions about employers' and employees' constitutional right to 'liberty of contract.'" Id. at 529 (Ginsburg, J., dissenting). So that's why "liberty of contract" is often thought of as a Lochner-era idea.

[15] Doe also invokes his constitutional "right to sue in court," but we don't see how that has any bearing on the denial of his motion to close trial.

of a federal civil trial.[16] See Standard & Poor's Corp., 541 F. Supp. at 1274 (permitting 40-50 minutes' worth of closure to protect trade secrets); Ospina v. Trans World Airlines, Inc., 975 F.2d 35, 36 (2d Cir. 1992) (permitting a brief closure while anti-terrorist measures on airlines discussed); Publicker Indus., 733 F.2d at 1074 (holding that the district court abused its discretion by closing a preliminary injunction hearing). And the only example of full trial closure that Doe produces on appeal is a juvenile case -- which is apples-and-oranges different from his suit (as that case itself explains). See In re T.R., 556 N.E.2d 439, 448 (Ohio 1990) ("Juvenile courts differ significantly from courts of general jurisdiction. . . . Consequently, juvenile courts have adopted unique methods of conducting their proceedings."). No error here.

**Second**, Doe says the district court misunderstood the balancing test established in Kravetz. Again, Kravetz made clear that the court must weigh "the nature and degree" of injury that public disclosure would cause, considering "the sensitivity of the information and the subject" and "how the person seeking access intends to use the information." 706 F.3d at 62. Doe says that

[16] We note here, also, that there are some mild waiver problems with Doe's argument that the district court "failed to consider" some of his "relevant case law," such as Ospina and In re T.R., neither of which he seems to have cited below. (The waiver issue, of course, is that a party can't fault a district court for not considering a case that they didn't cite below.)

the district court whiffed on that weighing; had it done its job properly, it (in Doe's words) "would have found that the sensitive nature" of the NDA "defeats public access," as evidenced by (1) all the press that lottery winners get generally and (2) all the press that this specific case has gotten.

But we think the district court's decision evinced careful consideration of Kravetz, as well as these factors and facts. See, e.g., Doe, 2025 WL 1080750, at *11-13. It acknowledged that Doe has argued this is a sensitive case focusing "on the parties' individual finances, family affairs including those involving their minor daughter, and may include information the parties deem to be embarrassing and that they would prefer to keep private." Id. at *11. And while the district court explained that it took such "considerations seriously," it remained true that (1) "courts often deal with information that people would prefer to keep out of the public eye," and (2) "if the wishes of litigants for privacy trumped the right of public access, courts would become publicly funded forums for private litigation, unaccountable to the public itself." Id. Further, the district court cited several cases in Maine highlighting how "courts routinely describe in published divorce cases the intimate financial circumstances of the divorcing couple, sometimes in detail," and "where children are involved, even in custody disputes, courts routinely issue publicly available orders." Id.

at *12 (cleaned up, collecting cases). Such discussion surely goes to the "nature and degree" of the injury, as well as the "sensitivity of the information and the subject," so we can't agree with Doe that the district court neglected evaluating the relevant factors under Kravetz. See 706 F.3d at 62; id. at 61 (explaining that "once the trial court has struck the balance, an appellate court will review its determination only for mistake of law or abuse of discretion").

Nor, on the question of how the people "seeking access intend[] to use [Doe's] information," do we think the district court erred in rejecting the notion that public access to this trial will "simply . . . cater to a morbid craving for that which is sensational and impure," despite Doe's contention otherwise. Kravetz, 706 F.3d at 62 (emphasis added) (cleaned up). That statement from Kravetz (itself cribbed from past cases) largely concerns the *unnecessary* release of "peripheral" information, which is why the "simply" is there in that quote. Id. (cleaned up). But we agree with the district court that, like it or not, Doe's identity is at "the heart of this dispute" that he's sued over. See Doe, 2025 WL 1080750, at *12.

**Third**, Doe claims the district court misconstrued the NDA by implicitly asserting Doe was "weaponizing" it against Smith to "gain leverage over her in their custody dispute." Doe says that the district court's discussion of how NDAs are a matter "of

public interest" actually reveals (1) an incorrect factual assumption by the district court, (2) an improper suggestion that Doe's NDA was unenforceable, and (3) an injudicious appearance of "misplaced sympathy for Smith as the silenced victim of a weaponized NDA." See id. at *13.

But after our own careful review of the record, we again see no reversible error. As to the first point, the district court simply said that this case takes place in "the broader context of contested custody litigation in state court." Id. at *12. That's undoubtedly true. This lawsuit was filed six months into the custody dispute which, as we understand it, was still ongoing when the district court considered the closure motion. As to the second point, the district court's discussion of caselaw about NDAs (including their unenforceability) was just an explanation of why a family dispute and an NDA would constitute a matter of public interest. See id. at *13. And as to the third point, we see no evidence that the district court based its decision on "misplaced sympathy" for Smith, given its careful explanation of the parties' positions and its extensive discussion of the law.

**Fourth and finally**, Doe asserts that "the District Court seemingly denied Doe's Motion for closure of trial *because he is rich*" (emphasis Doe's). We can't agree. True, the district court noted that a "party's wealth alone is not a legitimate reason to restrict the right of public access" and that federal judges swore

an oath to "do equal right to the poor and to the rich." See Doe, 2025 WL 1080750, at *13-14 (quoting 28 U.S.C. § 453). But in doing so, the district court was simply responding to a throughline of Doe's briefing -- that his newfound wealth, and the dangers that come with it, require closure of trial. See, e.g., id. (identifying Doe's filings stating that "[t]here are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and dramatic"). And, again, we think the district court's detailed discussion of the parties' positions and the law belies any suggestion that the motion was denied simply because Doe was rich. See generally id.

Having walked through Doe's arguments, we discern no abuse of discretion in the district court's denial of his motion to close trial based on the vibrant and presumptive common-law right of public access.

**B. Pseudonyms**

Next, we turn to Doe's lamentations about the district court's rejection of his proposal to use pseudonyms throughout trial. We again begin with a framework of analysis before turning to Doe's many gripes.

**Primer**

For starters, there is a "strong presumption against the use of pseudonyms in civil litigation."[17] MIT, 46 F.4th at 67. (Note that we're about to crib, rather heavily, from this case, which artfully explains the law in this area.)

There are plenty of good reasons for this presumption. For one, our country has a long-running tradition "of doing justice out in the open, neither in a corner nor in any covert manner." Id. at 68 (cleaned up). For another, "anonymizing the parties lowers the odds that journalists, activists, or other interested members of the public would catch wind of [judicial] mischief," such mischief being something we strive to avoid. Id. at 68-69 (cleaned up). And for a third, "litigating behind a curtain creates a shroud of mystery, giving the impression that something secret is going on," another thing we strive to avoid, given that a "judicial system replete with Does and Roes invites cynicism and undermines public confidence in the courts' work." Id. at 69 (cleaned up).

---

[17] For those interested in the presumption's doctrinal origins, we advise the curious reader to review Judge Selya's helpful description in MIT. See 46 F.4th at 67-68. But the SparkNotes is that "federal courts enforce the presumption against party pseudonyms in civil litigation under their inherent power to formulate procedural rules not specifically required by the Constitution or the Congress." Id. at 68 (cleaned up).

All those reasons explain why "litigation by pseudonym should occur only in exceptional cases." Id. at 70 (cleaned up). Although we've explained that the ultimate inquiry into finding an "exceptional" case is a "totality of the circumstances" test, we've recognized that "general guidelines" would be helpful for courts navigating this area. Id. Thankfully, we've identified a "workable methodology for sorting out the (relatively few) 'exceptional cases' in which pseudonymity should be allowed." Id. These narrow cases mainly fall into four paradigms:

1. A "would-be Doe who reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)." Id. at 71.
2. A case where "identifying the would-be Doe would harm innocent non-parties." Id. (cleaned up).
3. A case where "anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated." Id.
4. A case that is "bound up with a prior proceeding made confidential by law." Id.

But "[t]hese paradigms are rough cuts," so three more wrinkles guide our inquiry. Id. First, "it is possible that a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated." Id. Second, there may be "rare cases"

where, although the case fits within one or more paradigm, "either the need for openness or the prospect of serious prejudice to other parties from a grant of pseudonymity overwhelms the movant's privacy concerns." Id. And third, it's well possible that "these four paradigms" don't "capture the entire universe of cases in which pseudonymity may be appropriate," so at bottom, what courts should do is look at the "totality of the circumstances." Id.; see also id. at 70.

Last, but certainly not least, we note that the "party seeking pseudonymity bears the burden of rebutting the strong presumption against it." Id. at 73. Here, that's Doe.

## Discussion

Doe offers five main arguments that the district court erred in its analysis; some, though, contain a smorgasbord of sub-arguments. We will walk through them one-by-one to explain why, here too, we discern no abuse of discretion or error of law.

**First**, Doe complains that the district court "failed to consider all relevant circumstances" in its analysis. He identifies five that the district court supposedly failed to consider:

- The NDA's prohibition on the disclosure of Doe's identity;
- The lack of prejudice to Smith in continuing pseudonymity;

- The parties' consistent use of pseudonymity thus far;
- That the "actual identities" of the parties "will have no bearing on the outcome of the case and are of minimal interest to the public"; and
- The change in circumstance that "now justifies terminating pseudonymity."

Yet we think the district court's discussion reveals that such circumstances were adequately considered.

For one, Doe acknowledges that these arguments were largely housed in his "Motion for Leave to Proceed under Pseudonym," which he incorporated by reference in his motion for pseudonymity at trial. The district court (in its careful explanation of the parties' positions) twice noted that Doe "incorporates his arguments asserted in his November 15, 2023 motion to proceed under pseudonym." Doe, 2025 WL 1080750, at *3; id. at *14 ("In his memorandum, Mr. Doe refers to his original motion for leave to proceed under a pseudonym for the record support for his current position."). So we see no reason to think the arguments went unconsidered.

Likewise, just because the district court did not respond point-by-point to every item in an incorporated-by-reference motion does not mean the district court did not consider that motion; the detailed exposition it gave of

Doe's position adequately shows us that it reviewed all the relevant filings and, in rejecting his arguments, simply did not find them all relevant or convincing. See id. at *2-4, *14-16. And that isn't an abuse of discretion. See MIT, 46 F.4th at 70 (explaining that "district courts enjoy broad discretion to identify the relevant circumstances in each case and to strike the appropriate balance between the public and private interests" (emphasis added)); cf. United States v. Rodríguez, 178 F.4th 47, 54 (1st Cir. 2026) (quoting United States v. Rodríguez-Rosado, 909 F.3d 472, 480-81 (1st Cir. 2018)) (explaining, in the First Step Act context, that "simply because the district court didn't expressly mention" some points "doesn't mean it didn't consider" them, and affirming where "the record shows the district court adequately reviewed" the arguments before it).

So we won't fault the district court for rejecting every argument in Doe's brief line-by-line, particularly given (1) its careful attention to the parties' positions and (2) its specific acknowledgment of the materials Doe's saying it overlooked.

**Second**, Doe complains that the district court "failed to properly assess the three relevant paradigms warranting pseudonymity" -- the first, second, and third paradigms from MIT. To sort this out, we'll go paradigm-by-paradigm.

Remember, the first paradigm applies when a plaintiff "reasonably fears that coming out of the shadows will cause him

unusually severe harm (either physical or psychological)." MIT, 46 F.4th at 71. The district court thought this paradigm was implicated, and it explicitly considered the ten potential harms Doe claimed due to what he called "the unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and drastic."[18] See Doe, 2025 WL 1080750, at *14. But the district court reasonably explained why this situation didn't constitute "unusually severe" harm: "this rationale could be applied to a relatively large and certainly prominent slice of the American population." Id. at *14-15. And, as the district court explained,

> [The rationale] would extend beyond lottery winners to heirs to large fortunes, top tier professional athletes, highly successful entrepreneurs, nationally prominent entertainers, including actors and musicians, celebrities of all ilks, including those newly famous on social media; the list goes on and the risks can include members of their families.

Id. at *15. We think that amply explains why the harm wouldn't be "unusually" severe. And, either way, we don't think the district court erred in deciding that Doe's general invocations of the

[18] These ten harms are: "(1) kidnap for ransom, (2) stalking and harassment, (3) unwanted attention to his daughter, (4) increased attention to his other family members, (5) cybersecurity vulnerabilities, (6) impersonation and financial fraud, (7) media attention, (8) extortion, (9) solicitation for financial support, and (10) disruptions and restricted movement in daily life." Doe, 2025 WL 1080750, at *14.

possibility of such harms wasn't sufficient to meet his burden of rebutting the presumption against pseudonymity; and, on appeal, Doe does not, in our view, present more specific evidence of these purported harms. See Doe, 2025 WL 1080750, at *15 (explaining that "the Court concludes that Mr. Doe has not sustained his burden to demonstrate that he fits within the exceptional case where public access should be denied or significantly restricted"). So that one won't fly.

Now we move onto the second paradigm, which "involves cases in which identifying the would-be Doe would harm innocent non-parties." MIT, 46 F.4th at 71 (cleaned up). Doe argues that disclosing his and Smith's true identities would cause such harm to their daughter, who is undoubtedly an innocent non-party. The district court addressed this concern concisely yet comprehensively. It explained:

> [Doe's daughter] would be identified only by initials and Mr. Doe has provided no evidence for the Court to conclude that if his name were revealed, her privacy would be in jeopardy. Even if it could happen, this possibility does not justify denying the public the right to access this court proceeding.

Doe, 2025 WL 1080750, at *15. Given that the district court holds "broad discretion" as to whether "the need for anonymity in the case before it . . . outweighs the public's transparency

interest," we discern no abuse of discretion in its balancing here. MIT, 46 F.4th at 72.

The third paradigm is the last one Doe invokes. To remind, it "involves cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated." MIT, 46 F.4th at 71. Several types of cases fit under this paradigm, and Doe says his case is one where "the injury litigated against would be incurred as a result of the disclosure of the party's identity." Id. (cleaned up).[19] Doe says the district court erred here in a couple ways. For one, it supposedly erred in finding this paradigm not applicable. And flowing from that erroneous inapplicability determination, it purportedly failed "to determine whether denial of Doe's Motion to continue under pseudonyms would in effect constitute denial of access to the judicial system for him and similarly situated litigants" (Doe's words).

We offer a couple responses. First, we agree with Doe that the district court didn't think this paradigm was implicated. See Doe, 2025 WL 1080750, at *14 ("As the Court has analyzed it, only two of the four MIT factors appear in this case: Mr. Doe's

[19] Other examples of cases that fit into the third paradigm include those "involving intimate issues such as sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused minors," and those where "a potential party may be implicated in illegal conduct, thereby risking criminal prosecution." MIT, 76 F.4th at 71 (cleaned up).

fears of severe harm from disclosure and his concern of harm to his daughter, an innocent third party."). And maybe, if we were conducting a de novo review, we might agree that it was. But we aren't, and we don't think it was an abuse of discretion for the district court to not think so.

Indeed (and this is our second point) a reasonable reading of the district court's decision is simply that it didn't think Doe met his burden to show there was a "chilling effect on future litigants who may be similarly situated." See id. at *14-15 ("In short, *applying the four MIT guidelines*, the Court concludes that Mr. Doe has not sustained his burden to demonstrate that he fits within the exceptional case where public access should be denied or significantly restricted." (emphasis added)). And, based on the district court's reasoning, we agree that this case doesn't pose a chilling effect to future litigants. As the district court explained, Doe's "NDA contained the seeds of its own ineffectiveness" insofar as it failed to include a confidentiality clause requiring arbitration or mediation. See Doe, 2025 WL 1080750, at *15. So while we can appreciate Doe's attempts to align his case with those where the injury litigated against would be incurred as a result of the disclosure of his identity, we don't think it was clearly wrong for the district court to find this to be a situation of his own making. In that respect, we must agree with Smith that "the only chilling effect

on future lottery winners is that they will not use the NDA" that Doe used. To boot, the other cases that Doe cites don't further his cause under the third paradigm.[20]

---

[20] We'll address them briefly. In In re Exch. Union Co., No. 24-mc-91645-ADB, 2025 WL 894652, at *4 (D. Mass. Mar. 24, 2025), the district court granted a motion to proceed pseudonymously "for the limited purpose of moving to quash the subpoena," but noting that "[s]hould the Doe Intervenors lose their motion to quash the subpoena, they will be required to reveal their identities for any future filing in this action." The differences speak for themselves.

Similarly, in Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 159-61 (D. Mass. 2013), the magistrate judge granted a defendant's motion to proceed under pseudonyms for "preliminary matters." One such matter was a motion to quash a subpoena the plaintiff (a company suing a host of unnamed defendants for illegal distribution of copyrighted works) had issued to an internet service provider to obtain the defendants' info. The magistrate judge granted the pseudonymity motion because disallowing it would open a "backdoor route to the information" that the defendants were trying to protect via the motion to quash -- their identities. Id. at 161 (cleaned up). And the defendants (by virtue of being defendants) hadn't "purposefully availed" themselves of courts, that further favored pseudonymity. Id.

The others are just so different on the facts that they don't get us there. See Orr v. Trump, No. 1:25-cv-10313-JEK, 2025 WL 848691, at *2 (D. Mass. Mar. 18, 2025) ("The Court concludes that Boe's transgender identity and Soe's nonbinary identity are the sort of 'intimate' concerns encompassed by the third paradigm."); Doe v. U.S. Sec'y of State, 707 F. Supp. 3d 142, 144 (D.N.H. 2023) ("Finally, other persons in situations like Doe's," -- i.e., that of an "Afghani national who aided U.S. military efforts for several years" and who was now seeking a special immigration visa -- "would be dissuaded from seeking legal relief were his identity to be revealed. Such litigants would reasonably fear that they, too, could be discovered by the Taliban and exposed to mortal danger."); Doe v. Trs. of Bos. Univ., No. 24-cv-10619-FDS, 2024 WL 4700161, at *4 (D. Mass. Nov. 6, 2024) (permitting pseudonymity in a professor's challenge to a university's Title IX procedures because "he is challenging a finding of culpability and a record of allegations, in large part for fear of the impact they

Last, but surely not least, in the paradigm discussion, Doe laments that his case "implicates multiple paradigms," which (in his view) should have tilted the scales in his favor. Yet, aside from saying that the district court "should have analyzed whether, on the whole, Doe ultimately made a persuasive showing for pseudonymity," he doesn't explain what he means. It's true that "a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated." MIT, 46 F.4th at 72. But again, we think the district court considered MIT on the whole, and given that it reasonably didn't think any of the paradigms a good fit, we can't say it was an abuse of discretion for the district court not to find in Doe's favor on a cumulative theory. See Doe, 2025 WL 1080750, at *14-15 ("In short, *applying the four MIT guidelines*, the Court concludes that Mr. Doe has not sustained his burden to demonstrate that he fits within the exceptional case where public access should be denied or significantly restricted." (emphasis added)).

**Fourth**, Doe takes aim at the district court's resolution of the catch-22 as a "dilemma of his own making." To refresh, the

---

might have if publicized or communicated to potential future employers," and "were he to be identified in this litigation, his name would be publicly and permanently associated with that finding of culpability and those allegations, thus incurring the very injury litigated against" (cleaned up)).

district court suggested that Doe could have avoided the revelation of his identity had he included a confidential arbitration or mediation clause, but Doe's NDA didn't have such a clause. Doe, 2025 WL 1080750, at *15 (explaining that "Doe's NDA contained the seeds of its own ineffectiveness"). Doe responds by saying that he shouldn't be forced to choose between his right to sue in court and his right to privacy. But we think the district court nailed it when it explained as follows:

> A publicly filed court case is no longer a private matter. In bringing this case, Mr. Doe turned to a forum established by the United States Constitution, funded by American taxpayers, comprising a branch of the federal government, whose procedures must be open and whose rulings must be a matter of public record.

Id. at *10. We couldn't agree more. And although that passage had to do with trial closure, it has equal force in the pseudonymity context -- just because Doe has a right to sue does not mean he has a right to sue *anonymously*. See Doe v. Town of Lisbon, 78 F.4th 38, 48 (1st Cir. 2023) ("Volokh also asserts that . . . common law principles create a presumptive right of the public to know Doe's name now that he has filed suit. We agree.").

Doe also says that the district court erroneously determined that he "should have engaged in confidential arbitration," because "simply executing a confidentiality agreement does not guarantee that arbitration proceedings will

remain confidential." Maybe that's right, but we don't see why it ultimately matters. Surely the district court didn't abuse its discretion in observing that Doe's failure to include a confidential arbitration or mediation provision meant that his only option to enforce his rights was likely to sue in court -- where (to remind) there is a "strong presumption against the use of pseudonyms." MIT, 46 F.4th at 67 (cleaned up).

**Fifth**, Doe argues that the district court denied him pseudonymity because he was wealthy. If the reader thinks that sounds a lot like his last argument in the "trial closure" section, the reader would be right. Doe gets a bit more specific here, drawing our attention to the district judge's statements about how he was part of the "entire tier of rich and famous persons" that could face harm because of their publicity and how, with his newfound wealth, he had more resources to mitigate risk and protect himself. Doe, 2025 WL 1080750, at *15.

But Doe again seems to forget that he was the one who raised the issue of his wealth. Straight from one of his filings: "There are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and dramatic." Doe, 2025 WL 1080750, at *13 (quoting ECF No. 4, Doe's Motion for Leave to Proceed Under Pseudonym). That the district court explained why his wealth, as well as the risks it brings, did not entitle him to pseudonymity

is not an abuse of discretion. Id. at *15; see also MIT, 46 F.4th at 70 (explaining that "district courts enjoy broad discretion to identify the relevant circumstances in each case and to strike the appropriate balance between the public and private interests").

So, on pseudonymity, we won't say more.

**CASH OUT**

The district court honorably upheld its duty to "do equal right to the poor and to the rich." See 28 U.S.C. § 453. So we **affirm**. (And, btw, costs to appellees.)